Lucille JEFFREY et al., on their behalf and on behalf of all others similarly situated, Plaintiffs-Appellants,

v.

SOUTHWESTERN BELL et al., Defendants-Appellees.

No. 74–2398.

United States Court of Appeals, Fifth Circuit.

Sept. 8, 1975.

Alan M. Glassman, Stephen R. Sundgaard, Dallas, Tex., for plaintiffs-appellants.

Ford W. Hall, J. H. Hand, Dallas, Tex., for Southwestern Bell Tel.

Mark Martin, Wilson W. Herndon, Dallas, Tex., for Western Elec.

Before BROWN, Chief Judge, and GEWIN and THORNBERRY, Circuit Judges.

GEWIN, Circuit Judge:

Residential telephone subscribers in Dallas, Texas instituted this suit to challenge allegedly anticompetitive practices of Southwestern Bell Telephone Company, American Telephone and Telegraph Company, and Western Electric Company, Inc. The district court dismissed the action on the pleadings because appellants lacked standing. We affirm the trial court's disposition for two reasons: first, appellants were not the "targets" of the allegedly monopolistic activity, and second, the "state action" exemption bars antitrust attack upon the rate structure, or any portion of it, established by local governing bodies.

Southwestern Bell, like many public utilities, enjoys monopoly status in the Dallas area as the sole provider of residential and business telephone service. Its sibling company, Western Electric, is not, however, the exclusive supplier of telephone equipment; other independent firms compete in the sale and lease of telephonic material.[1]

In Texas local rates are not set by a statewide commission, but by separate municipalities. Art. 1119, Vernon's Tex. Rev.Civ.Stat. (1963). The governing body of each city or town determines a reasonable rate of return based on the value of the telephone company's property devoted to local service. Art. 1124, Tex.Rev.Civ.Stat. (1963). Presented with an accounting of the utility's financial dealings, the municipality establishes intra-city rates to be charged subscribers.

Appellants, and the class of residential users they represent, complain that they must pay unnecessarily high monthly rates because of appellees' antitrust violations. These residential subscribers eschew any direct attack on the rates themselves. Instead, they allege that Southwestern Bell and the other appellees have attempted to monopolize the telephone equipment market through such illegal means as below-cost pricing. Appellants argue that since the appellees lose profits in the equipment sector, the telephone company must recoup such losses by charging residential customers more; *i. e.* that residential subscribers, in effect, are required to subsidize appellees' anticompetitive practices.

Appellants rely on both the treble damage and injunctive provisions of the Clayton Act as grounds for relief. 15 U.S.C. §§ 15, 26. The section authorizing triple monetary recovery reads:

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore in any district court . . . and shall recover threefold the damages by him sustained . . .. 15 U.S.C.A. § 15.[2]

---

1. Appellants allege, at page 3 of their amended complaint, that appellees Southwestern Bell, American Telephone and Telegraph, and Western Electric have conspired to eliminate competition in the equipment sector.

  Appellees explain the interlocking relationship of the three companies in their Brief in Support of Motion to Dismiss, at page 3:

  Plaintiffs name as Defendants not only Southwestern Bell, which provides telephone service in Dallas, but also its parent corporation, AT & T, and another AT & T subsidiary corporation, Western. Western manufactures telecommunications equipment, which it sells, together with supplies and various services, to Bell System operating telephone companies, including Southwestern Bell.

2. Though we have serious doubts as to whether appellants have sufficiently asserted injury to their "business or property," we expressly pretermit decision of that question. In *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972), the Supreme Court stated that the "business or property" requirement refers to "commercial interests or enterprises." *Id.* at 264, 92 S.Ct. at 892, 31 L.Ed.2d at 193–94. Plaintiffs' subscription to residential telephones would not fit within the category of commercial endeavor, because residential telephones are used primarily for personal pleas-

Though the literal import of the statute would indicate that anyone, no matter how remotely injured by an antitrust violation, can sue, courts have taken a more restrained view of standing under § 4 of the Clayton Act (15 U.S.C. § 15). Stockholders, employees, and creditors of an injured corporation, as well as suppliers of an injured customer, have been denied recovery because their injuries are too "indirect", "secondary", or "remote." *Kauffman v. The Dreyfus Fund, Inc.,* 434 F.2d 727 (3d Cir. 1970); *Walker Distributing Co. v. Lucky Lager Brewing Co.,* 323 F.2d 1 (9th Cir. 1963); *Volasco Products Co. v. Lloyd A. Fry Roofing Co.,* 308 F.2d 383 (6th Cir. 1962); *Martens v. Barrett,* 245 F.2d 844 (5th Cir. 1957). Such persons suffer a pocketbook injury from antitrust violations, but they are not the "targets" of anticompetitive practices. The "target area" test arose as a means of limiting the class of potential treble-damage plaintiffs to those persons who could most adequately vindicate the purposes of the antitrust laws. To attain standing a person (whether corporation or individual) must be one against whom the conspiracy is aimed. Or, put in plutonomic terms, the complainant must show that he is within that sector of the economy which is endangered by a breakdown of competitive conditions in a particular industry. *In re Multidistrict Vehicle Air Pollution M.D.L. No. 31,* 481 F.2d 122 (9th Cir. 1973); *Calderone Enterprises Corp. v. United Artists Theater Circuit,* 454 F.2d 1292 (2d Cir. 1971); *Mulvey v. Samuel Goldwyn Productions,* 433 F.2d 1073 (9th Cir. 1970); *Dailey v. Quality School Plan, Inc.,* 380 F.2d 484 (5th Cir. 1967); *South Carolina Council of Milk Producers v. Newton,* 360 F.2d 414 (4th Cir. 1966); *Karseal Corp. v. Richfield Oil Corp.,* 221 F.2d 358 (9th Cir. 1955); *Conference of Studio Unions v. Loew's,* 193 F.2d 51 (9th Cir. 1951); *Stern v. Lucy Webb Hayes National Training School,* 367 F.Supp. 536 (D.D.C.1973).

Although the ripple effects of an antitrust violation are inevitably felt throughout various levels of the economy, the "target area" test ensures against potentially disastrous recoveries by those only tenuously hurt. *Calderone Enterprises Corp. v. United Artists Theater Circuit, supra.* The Supreme Court has indicated approval of the judicially-imposed limitations on standing under § 4:

> The lower courts have been virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation. *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 263, 92 S.Ct. 885, 891, 31 L.Ed.2d 184, 193 n.14 (1973) (citations omitted).

■ The antitrust conspiracy at the heart of appellants' complaint was aimed at manufacturers, sellers, and lessors of telephone equipment. As residential subscribers, appellants are located far from the target area. They engage in no activity within the equipment sphere. In addition, the Dallas City Council is interposed between appellants and the alleged victims of the conspiracy as an arbiter of fair and reasonable rates. In short, appellants are so far removed from the bull's eye that they are "not

---

ure or private matters, rather than in earning a livelihood. In the same passage, however, the Court allowed the State of Hawaii to sue in its proprietary capacity by stating:

> Where the injury to the State occurs in its capacity as a consumer in the marketplace, through a 'payment of money wrongfully induced,' *Chattanooga Foundry & Pipe Works v. City of Atlanta,* 203 U.S. 390, 396, [27 S.Ct. 65, 66, 51 L.Ed. 241, 244] (1906), damages are established by the amount of the overcharge. *Id.* 405 U.S. at 263, 92 S.Ct. at 891, 31 L.Ed.2d at 193 n.14.

Appellants are clearly consumers of the telephone company's services, and they allege injury through the payment of unreasonably high rates. Hence, it may be argued that their allegations come within the literal wording of the Supreme Court language. Because of the seemingly conflicting interpretations of the statutory phrase, we assume, without deciding, that appellants have asserted an injury to their "business or property."

even on the firing range." *In re Multidistrict Vehicle Air Pollution M.D.L. No. 31, supra.*

Appellants' prayer for injunctive relief raises slightly different questions concerning standing to sue. Unlike § 4 of the Clayton Act, § 16 has no business or property requirement.[3] 15 U.S.C. § 26. The complainant "need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Zenith Radio Corp. v. Hazeltine Research,* 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129, 152 (1969). Moreover, the remedies contained in the two sections are quite distinct. Section 16 carries none of the risk of potentially disastrous monetary judgments or duplicative recoveries. *See Hawaii v. Standard Oil Co., supra.* Because of these differences, courts take a less constrained view of standing in suits involving injunctive relief than in those demanding treble damages. *In re Multidistrict Vehicle Air Pollution M.D.L. No. 31, supra.* To achieve standing under § 16 the petitioner must demonstrate that he is threatened with loss or injury proximately resulting from the antitrust violation. *Credit Bureau Reports, Inc. v. Retail Credit Co.,* 476 F.2d 989 (5th Cir. 1973).

■ Hence, the pivotal issue for standing under § 16 is proximate cause. In a similar context, the Seventh Circuit has stated:

The consumers' rights, if any, to reparation for their consequential hurt arise from higher rates and charges for services provided by plaintiffs [public utilities]. [This] is the proximate cause of their injur[ies], not the antitrust violation[s]. . . . The impact on them was remote and took the shape of allegedly higher rates paid for utility services—rates established. as legal by the Illinois Commerce Commission. *Commonwealth Edison Co. v. Allis-Chalmers Manufacturing Co.,* 315 F.2d 564, 567 (7th Cir. 1963).

As noted in our previous discussion, appellants were twice removed from the object of the conspiracy; manufacturers of telecommunications equipment were the alleged victims, and the Dallas City Council actually imposed the rates on residential subscribers. The pocketbook injuries suffered by consumers are too remotely related to appellees' conduct in the equipment sector to confer standing even under the eased requirements of § 16.

In addition, appellants' antitrust attack fails on the merits under the doctrine of *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). In *Parker* the California legislature authorized a state commission to stabilize the price of agricultural commodities, in order to protect farmers from calamitous price upheavals. Local committees were charged with setting prices for various products, subject to commission approval. The Court held that although such practices might have distinctly anticompetitive effects, they were immune from antitrust attack since the Sherman and Clayton Acts were not designed to interfere with valid governmental action. Thence sprung the "state action" exemption from the antitrust laws.

In *Continental Ore Co. v. Union Carbide,* 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962), however, the Court refused to exonerate an alleged monopolizer simply because an agency of the Canadian government had purchased ore from the company as permitted by Canadian law. The purchases were not compelled by any Canadian statute, and discriminatory purchasing had not been approved by any branch of the Canadian government. The recent decision of *Goldfarb v. Virginia State Bar,* —— U.S. ——, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), further elaborates the restrictions on the *Parker v. Brown* doctrine. In a suit attacking the price-fixing attributes of minimum fee schedules promulgated by state and county bar associations, under the auspices of the State Supreme Court, the United States Supreme Court

3. See note 2, *supra.*

held the respondents could not escape liability under the "state action" rubric. In essence, the Court found that although the fees may have been tacitly approved by the state legislature, such schedules were not the product of the State acting as sovereign:

The threshold inquiry in determining if an anticompetitive activity is state action of the type the Sherman Act was not meant to proscribe is whether the activity is required by the State acting as sovereign. *Parker v. Brown, supra,* 317 U.S. at 350–352 [63 S.Ct. 30], at 313–314; *Continental Ore Co., v. Union Carbide,* 370 U.S. 690, 706–707 [82 S.Ct. 1404, 1414–1415, 8 L.Ed.2d 777] (1962). Here we need not inquire further into the state action question because it cannot fairly be said that the State of Virginia through its Supreme Court Rules required the anticompetitive activities of either respondent. Respondents have pointed to no Virginia statute requiring their activities; state law simply does not refer to fees, leaving regulation of the profession to the Virginia Supreme Court; although the Supreme Court's ethical codes mention advisory fee schedules they do not direct either respondent to supply them, or require the type of price floor which arose from respondent's activities. Although the State Bar apparently has been granted the power to issue ethical opinions there is no indication in this record that the Virginia Supreme Court approves the opinions. Respondents' arguments, at most, constitute the contention that their activities complemented the objective of the ethical codes. In our view that is not state action for Sherman Act purposes. It is not enough that, as the County Bar puts it, anticompetitive conduct is 'prompted' by state action; rather, anticompetitive activities must be *compelled by direction of the State acting as a sovereign. Id.* —— at ——, 95 S.Ct. at 2015 (emphasis supplied).

In the present case appellants seek to enjoin appellees from "further violations of the antitrust laws."[4] Though they claim to be attacking only the equipment-selling practices of appellees, an examination of the record and relief sought demonstrates that appellants in fact assail the rate-making process entrusted to municipal governments in Texas.

As mentioned above, the state legislature has delegated the authority to regulate intra-city rates to municipalities, *City of Houston v. Southwestern Bell Telephone Co.,* 263 S.W.2d 169 (Tex.Civ. App. 1953, writ ref'd), and said rates must reflect a fair return on the fair value of property devoted to city service. Art. 1124, *supra.* Hence, the Dallas City Council is charged with examining the totality of the utility's financial endeavors—including the costs of operation and revenues received from a variety of sources—to arrive at an equitable rate. It has the power pursuant to city charter to scrutinize all company books and call witnesses to ascertain the true amount of receipts and expenditures incurred by the franchisee-utility. Dallas, Tex., Charter ch. 19 § 4 (1968).

■ We can scarcely envision a function more particularly "sovereign" than the implementation of a rate structure on a public utility. The franchisee enjoys monopoly status within the community as the sole provider of the service involved, and the city council has a duty to the citizenry to ensure that the rates charged are fair. We cannot assume, as petitioners would have us believe, that the city council ignored respondents' sales history in the equipment sector in arriving at a reasonable rate.

This court has previously held that rate-setting activities performed by governmental bodies are exempt from antitrust attack. *Alabama Power Co. v. Alabama Electric Cooperative, Inc.,* 394 F.2d 672 (5th Cir.), *cert. denied,* 393 U.S. 488, 89 S.Ct. 488, 21 L.Ed.2d 465 (1968). As we stated in *Gas Light Co. of Columbus v. Georgia Power Co.,* 440 F.2d 1135, 1140 (5th Cir. 1971):

---

4. Plaintiffs' complaint at 6.

**1134**

Our view is that the *Parker* exclusion applies to the rates and practices of public utilities enjoying monopoly status under state policy when their rates and practices are subjected to meaningful regulation and supervision by the state to the end that they are the result of the considered judgment of the state regulatory authority.

There is nothing to indicate that proceedings before the Dallas City Council were perfunctory or slipshod. Petitioners admit they appeared before the council in lengthy hearings prior to adoption of the final rate. *See George R. Whitten, Inc. v. Paddock Pool Builders, Inc.,* 424 F.2d 25 (1st Cir. 1970). Regulation by a governmental body of the rates to be charged by a public utility are a classic example of the *Parker v. Brown* exemption.

The judgment of the district court is affirmed.