**MIDESSA TELEVISION COMPANY,**
**Plaintiff-Appellant,**

v.

**MIDESSA TELECASTING COMPANY,**
**INC., et al., Defendants-Appellees.**

No. 78–2515.

United States Court of Appeals,
Fifth Circuit.

May 29, 1980.

Rehearing Denied June 25, 1980.

Gerald K. Fugit, Odessa, Tex., Stephen D. Susman, Terrell Oxford, Robert D. Daniel, Houston, Tex., for plaintiff-appellant.

John H. Shenefield, Asst. Atty. Gen., Robert B. Nicholson, William D. Coston, Attys., Dept. of Justice, Washington, D. C., for amicus curiae.

Carrington, Coleman, Sloman & Blumenthal, James A. Ellis, Jr., Dallas, Tex., for Midessa Television Co., Inc.

Harman & Harman, Brooks L. Harman, Odessa, Tex., for Doubleday Broadcasting Co., Inc.

Stubbeman, McRae, Sealy, Laughlin & Browder, W. B. Browder, Jr., Midland, Tex., for Tall City Cable T.V., Inc.

Shafer, Gilliland, Davis, Bunton & McCollum, W. O. Shafer, Odessa, Tex., for Community Cablevision of Odessa, Inc.

Finley & Scogin, Robert Scogin, Kermit, Tex., for Communicable of Texas, Inc.

Kerr, Fitz-Gerald & Kerr, Wm. Monroe Kerr, Midland, Tex., for J. J. Howard Hodge & Hodge Enterprise, Inc.

William C. McClearn, Denver, Colo., for Cablecom-General, Inc.

Before TUTTLE, * AINSWORTH and SAM D. JOHNSON, Circuit Judges.

AINSWORTH, Circuit Judge:

This is an antitrust suit brought by a UHF television station against a cable television company and its co-owners alleging that its refusal to carry plaintiff's UHF signal on its cable violated the antitrust laws.[1] The district court granted defendants' motion for summary judgment primarily on the ground that federal regulation of cable television created an implied immunity from the effect of the antitrust laws. We reverse.

Plaintiff Midland Telecasting Company (Midland) operated a UHF television station from Midland, Texas. It broadcast on Channel 18 from June 8, 1969 to March 16, 1971 and from March 26, 1973 to October 15, 1974.

In 1967, defendant Community Cablevision Company (CCC) was created for the purpose of operating a community antennae television (CATV) system in nearby Odessa, Texas. CCC was a joint venture by defendants Midessa Television Company (Midessa), Doubleday Broadcasting Company (Doubleday), Hodge Enterprises, J. Howard Hodge, and Cablecom-General, Inc. Both Midessa and Doubleday were direct competitors with Midland. Midessa operated a VHF station, affiliated with NBC, located between Midland and Odessa. Doubleday operated another network-affiliated VHF station located in Odessa. In 1968, CCC was granted an exclusive franchise by the City of Odessa to operate a CATV or cable system in Odessa. CCC carried the signals of the three VHF stations serving the Midland-Odessa area including the signals of the two VHF stations owned by joint venturers Midessa and Doubleday.[2] By the end of 1971, a significant portion of the homes in Odessa subscribed to CCC's cable system.

In its complaint,[3] Midland alleged that from 1969 until the filing of this suit in 1974, CCC refused to carry Midland's signal on its cable despite repeated requests to do so, and that the refusal was designed to eliminate Midland from the Midland-Odessa television broadcasting market. As a result, it is averred that Midland could not become a "commercially viable enterprise" or obtain network affiliation, and was forced to halt broadcasting from March 1971 until March 1973 and later from October 1974 until the present time. Thus, Midland alleged that from 1969 until 1974, the defendants engaged in a continuing combination and conspiracy to restrain competition in the television broadcasting industry in the Midland-Odessa market in violation of section 1 of the Sherman Act, 15 U.S.C. § 1.[4] Midland sought treble damages pursuant to section 4 of the Clayton Act, 15

---

* Judge Tuttle did not participate in either the consideration or determination of this case.

1. Suit was also brought against two companies involved in the operation of broadcasting in nearby communities but who were not co-owners of the cable company.

2. Besides the stations owned by defendants Midessa and Doubleday, CCC carried the third VHF station operating in the Midland-Odessa area. That station was not involved in the CCC joint venture.

3. The allegations are set forth in Midland's Third Amended Complaint filed August 9, 1976 (R. 647). Midland moved for leave to file a Fourth Amended Complaint. After hearing oral argument, the district court did not rule on the motion prior to entering its order dismissing the action.

4. Midland also claimed that the formation of CCC by Midland's competitors constituted a violation of section 7 of the Clayton Act, 15 U.S.C. § 18. The district court did not rule on the applicability of section 7 to the facts alleged in this suit, and accordingly this issue is not

**1144**

U.S.C. § 15, as well as injunctive relief and attorney's fees.

 The district court granted defendant Midessa's motion to dismiss and for summary judgment on the basis of findings of fact and conclusions of law prepared by counsel for Midessa.[5] While the district court relied on a number of grounds, it primarily found that (1) Midland lacked standing to assert the claim, and (2) defendants were immune from antitrust scrutiny by virtue of federal regulation over cable television.[6] We discuss these points in order.

presented on appeal. Midland's Fourth Amended Complaint raised claims based on section 2 of the Sherman Act, 15 U.S.C. § 2. Since the district court did not rule whether Midland could file its amended complaint, the section 2 claim is also not raised on appeal.

5. A district court's acceptance of the findings of fact and conclusions of law prepared by the prevailing party to a suit, while not prohibited, should be discouraged since it leaves the reviewing court with doubt concerning the actual basis of the trial judge's decision. *See Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 257–258 (5th Cir. 1980).

6. Three other issues raised by the district court's decision do not require extended discussion.

First, appellees argue that CCC's refusal to carry Midland's signal is protected by the *Noerr-Pennington* doctrine because CCC would have had to obtain FCC approval in order to carry the signal. *See Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). The basis of the doctrine is the "need to protect efforts directed to government officials for the purpose of seeking redress." *Mid-Texas Communications Systems, Inc. v. AT&T*, 615 F.2d 1372, 1382 (5th Cir. 1980). Here, appellees do not claim that they did anything designed to influence the FCC directly, but rather that they are entitled to *Noerr-Pennington* protection for failing or refusing to bring an administrative proceeding. As such, there was no effort to influence governmental action within the meaning of the doctrine. *Cf. Mid-Texas Communications*, 615 F.2d at 1384.

Appellees also argue that the district court's decision should be affirmed because there was no issue of material fact. In similar circumstances, the Supreme Court has stated that "summary procedures should be used sparingly in complex antitrust litigation where motive

## 1. STANDING

 Standing for damage actions under the antitrust laws is controlled by section 4 of the Clayton Act which grants standing to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . ." 15 U.S.C. § 15. *See* 2 P. Areeda & D. Turner, Antitrust Law § 334a (1978). The allegations in this case are clearly sufficient to afford Midland standing. Midland alleged injury in fact to its business in that it lost advertising revenues and was forced to stop broadcasting because of

and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot . . . Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of 'even handed justice.' " *Poller v. CBS*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). *See Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc.*, 394 U.S. 700, 89 S.Ct. 1391, 22 L.Ed.2d 658 (1969); *Dailey v. Quality School Plan, Inc.*, 380 F.2d 484, 486 (5th Cir. 1967). Here, contrary to the district court's resolution, it is clear that there exist several issues of material fact. Foremost is the motive and intent of the appellees in refusing Midland's requests to have its signal carried. The fact that Midland does not have any direct evidence of improper motive is not determinative as the Supreme Court made clear in *Poller*. Appellees' asserted defense that Midland's signal was too weak to be carried, while it may present an adequate defense at trial, *cf. E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee*, 467 F.2d 178 (5th Cir. 1972), must be proven first and the quality of Midland's signal is disputed. Accordingly, summary judgment was not warranted since issues of material fact existed which should be resolved by a jury.

Finally, appellees contend that Midland cannot collect any damages for the period from March 16, 1971 to March 26, 1973 since Midland was not then broadcasting a signal. But if appellees' alleged illegal conduct was the proximate cause of Midland's inability to broadcast, appellant is entitled to recover lost profits even though it was not broadcasting. *See Terrell v. Household Goods Carriers' Bureau*, 494 F.2d 16, 23–24 (5th Cir. 1974). *See generally* Note, *Private Treble Damage Antitrust Suits: Measure of Damages for Destruction of All or Part of a Business*, 80 Harv.L.Rev. 1566 (1967). The question whether appellees' actions were responsible for Midland's failure to broadcast, and if so, what damages, if any, were sustained, are issues of fact to be resolved by the jury.

CCC's refusal to carry its signal. Antitrust liability is based upon the theory that defendants either took part in a group boycott, *see Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), or acted in concert to refuse access to an essential facility, *see United States v. Terminal Railroad Association*, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912). As such, the alleged injury is the type which if proven the antitrust laws seek to prevent. Finally, the injury is alleged to be the direct result of defendants' unlawful conduct.

The district court's reliance on *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) and *Jeffrey v. Southwestern Bell*, 518 F.2d 1129 (5th Cir. 1975) on the issue of standing is misplaced. In *Brunswick*, operators of bowling alleys sought damages for profits allegedly lost when defendant unlawfully acquired certain unprosperous alleys and operated them itself instead of permitting them to fail. The Supreme Court denied recovery since plaintiffs had failed to demonstrate "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick*, 429 U.S. at 489, 97 S.Ct. at 697. It is clear that in the present case the injury alleged flows directly from defendants' group boycott or refusal to deal. In *Jeffrey*, residential telephone subscribers challenged Bell's equipment policies of buying only from its wholly-owned subsidiary. This court held that Bell's retail customers were not the "target" of the alleged monopolistic practices and therefore did not have standing since they could not "adequately vindicate the purposes of the antitrust laws." *Jeffrey*, 518 F.2d at 1131. The court stated that antitrust standing should be granted to that "sector of the economy which is endangered by a breakdown of competitive conditions in a particu-

lar industry." *Id.* Midland, under the allegations in its complaint, was the target of the conspiracy and as such is an adequate representative of that sector of the economy which is threatened by the alleged anti-competitive acts of the defendants. As such, Midland has standing under section 4.

## 2. IMPLIED IMMUNITY

█ It is undisputed that the Federal Communications Act of 1934 (the Act), 47 U.S.C. § 151 *et seq.*, does not explicitly provide an exemption from the antitrust laws for a cable television company's decision as to which signals it will carry.[7] The district court, however, held that the existence of Federal Communication Commission's (FCC) regulation concerning carriage of signals by cable systems created an implied immunity from the antitrust laws for CCC's refusal to carry Midland's signal.

█ The Supreme Court has held that "[r]epeals of the antitrust laws by implication from a regulatory statute are strongly disfavored, and have only been found in cases of plain repugnancy between the antitrust and regulatory provisions." *United States v. Philadelphia National Bank*, 374 U.S. 321, 350–51, 83 S.Ct. 1715, 1734–35, 10 L.Ed.2d 915 (1963) (footnotes omitted). *See Cantor v. Detroit Edison Co.*, 428 U.S. 579, 595–98, 96 S.Ct. 3110, 3120, 49 L.Ed.2d 1141 (1976). Judicial unwillingness to imply an immunity reflects the importance of antitrust principles in the structure of the American economy. By enacting the antitrust laws, Congress intended to "establish a regime of competition as the fundamental principle governing commerce in this country." *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 398, 98 S.Ct. 1123, 1129, 55 L.Ed.2d 364 (1978) (footnote omitted). *See Carnation Co. v. Pacific Westbound Conference*, 383 U.S. 213, 218, 86 S.Ct. 781, 784, 15 L.Ed.2d 709 (1966). Accordingly, antitrust immunity will be im-

7. The Communications Act provides explicit exemptions from the antitrust laws only for telephone company consolidations and acquisitions. 47 U.S.C. §§ 221(a), 222(c)(1). The existence of an explicit exemption covering certain acts is evidence that Congress did not intend to grant immunity to other acts not covered by the explicit exemptions. *See, e. g., California v. FPC*, 369 U.S. 482, 485, 82 S.Ct. 901, 904, 8 L.Ed.2d 54 (1962); *Cain v. Air Cargo, Inc.*, 599 F.2d 316, 320 (9th Cir. 1979).

plied only if necessary to permit the regulatory scheme to function, and then only to the "minimum extent necessary." *Silver v. New York Stock Exchange*, 373 U.S. 341, 357, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389 (1963). *See Mid-Texas Communications Systems, Inc. v. AT&T*, 615 F.2d 1372, 1379 (5th Cir. 1980).

The starting point for determining the existence of an implied immunity is the intent of Congress. *United States v. Borden Co.*, 308 U.S. 188, 198, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939). The Act does not explicitly provide for FCC authority to regulate cable television since in 1934 when it was passed Congress did not anticipate the development of cable technology. With the advent of the cable systems during the 1950s, the FCC studied possible regulatory responses to the potential conflict between cable and television broadcasting. In 1959, the FCC concluded that since cable operators were neither common carriers nor broadcasters within the meaning of the Act, it had no authority to regulate them. *CATV and TV Repeater Services*, 26 F.C.C. 403 (1959). After an unsuccessful attempt to obtain clarifying legislation from Congress, the FCC reversed its position and asserted jurisdiction over cable broadcasting. *Carter Mountain Transmission Corp.*, 32 F.C.C. 459 (1962), *aff'd*, 321 F.2d 359 (D.C.Cir. 1962), *cert. denied*, 375 U.S. 951, 84 S.Ct. 442, 11 L.Ed.2d 312 (1963). In 1966, the FCC issued a comprehensive order setting forth regulations for the industry. *Second Report and Order*, 2 F.C.C.2d 725 (1966). *See generally* Smith, *Primer on the Regulatory Development of CATV* (1950–72), 18 Howard L.J. 729 (1975). *See also* D. LeDuc, *Cable Television and the FCC: A Crisis in Media Control* (1973).

The Supreme Court upheld the FCC's general authority to regulate cable television in *United States v. Southwestern Cable Co.*, 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968). Despite the lack of explicit authorization, the Court based its decision on the fact that Congress had granted the FCC broad authority over "all interstate and foreign communication by wire or radio . . . ." 47 U.S.C. § 152(a). *Southwestern Cable, supra*, 392 U.S. at 167–68, 88 S.Ct. at 2000. *See United States v. Midwest Video Corp.*, 406 U.S. 649, 92 S.Ct. 1860, 32 L.Ed.2d 390 (1972). The FCC's power over cable television, however, is not unlimited. The FCC can regulate cable television only where its regulations are "reasonably ancillary to the effective performance of [its] various responsibilities for the regulation of television broadcasting." *Southwestern Cable*, 392 U.S. at 178, 88 S.Ct. at 2005. *See Brookhaven Cable TV, Inc. v. Kelly*, 573 F.2d 765, 767 (2d Cir. 1978) (FCC may regulate cable systems if it furthers a "goal which [the FCC] is entitled to pursue in the broadcast area"), *cert. denied*, 441 U.S. 904, 99 S.Ct. 1991, 60 L.Ed.2d 372 (1979). Thus, the Supreme Court recently rejected an effort by the FCC to compel cable systems to provide common carriage of public-originated transmissions because doing so would convert cable broadcasters into common carriers which is inconsistent with FCC authority over broadcasting. *FCC v. Midwest Video Corp.*, 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979). *See Home Box Office v. FCC*, 567 F.2d 9 (D.C.Cir. 1977), *cert. denied*, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977). *See generally* Comment, *FCC Authority Over Cable Television*, 1979 Wisc.L.Rev. 962.

An examination of FCC regulation concerning carriage access rules for cable systems in effect during the period 1969–1974 shows that CCC was not prevented from carrying Midland's signal by reason of regulatory constraints. Until 1972, carriage access requirements were covered by the FCC's *Second Report and Order*, 2 F.C.C.2d 725 (1966) [*1966 Rules*]. Cable companies were required to carry the signals of any local broadcast station. *1966 Rules*, 2 F.C.C.2d at 752–53. They were not permitted to import distant signals into the nation's 100 largest television markets. *1966 Rules*, 2 F.C.C.2d at 782. The FCC also provided for certain restrictions to minimize duplication of programming. *1966 Rules*, 2 F.C.C.2d at 747. None of the restrictions established by the 1966 Rules was applicable to

Midland's signal. Accordingly, while it is not clear whether Midland was a local broadcaster in the Odessa community so that its signal would have been required to be carried, it is certain that the 1966 Rules did not prohibit CCC's carriage of Midland's signal. Moreover, under the 1966 Rules, there was no requirement that a cable system obtain FCC approval prior to carrying a station's signal. The cable company simply had to notify the station and the FCC of its action. *1966 Rules*, 2 F.C.C.2d at 803–04 (§ 74.1105).

The carriage rules were amended in 1972. *Cable Television Report and Order*, 36 F.C.C.2d 141 (1972) [*1972 Rules*]. The FCC divided television markets by size and promulgated rules for each type market. Since the Midland-Odessa market was not one of the top 100 television markets, the "smaller television market" rules were applicable to CCC. *1972 Rules*, 36 F.C.C.2d at 214 (§ 76.5(i)). As a general matter, the FCC carriage provisions were designed to assure that all "local" stations were carried on a cable system. *1972 Rules*, 36 F.C.C.2d at 173. "Local" was defined to include signals of stations within 35 miles of the cable system. The 35-mile provision was especially designed to aid in the development of UHF stations. As the FCC stated in its report:

> All cable systems must carry, on request, the signals of all stations licensed to com-
> munities within 35 miles of the cable system's community. This requirement, based on policy considerations similar to those underlying existing carriage rules, is intended to aid stations—generally UHF—whose Grade B contours are limited. In this manner less powerful stations will be able to compete with more powerful stations in the same market more effectively than they could under our old carriage rules; they will be capable of extending their coverage into the area that we have determined is generally necessary for the development of broadcasting stations.

*1972 Rules*, 36 F.C.C.2d at 174 (footnote omitted). The 1972 Rules also changed the notification requirement relating to a cable system adding a signal. Specifically, the new rule provided that "[n]o cable television system shall commence operations unless it receives a certificate of compliance from the Commission." *1972 Rules*, 36 F.C.C.2d at 217 (§ 76.11(a)). As with the 1966 Rules, nothing in the FCC regulations prohibited carriage of Midland's signal.[8]

A cable broadcaster's selection of signals to be carried on its cable is significant. The array of stations offered to potential subscribers is one of the primary selling points of the cable system. Accordingly, the cable company's decision on which stations to carry is an important exercise of

---

**8.** The rules promulgated by the FCC for smaller television markets are as follows:

§ 76.59 *Provisions for smaller television markets.*

A cable television system operating in a community located in whole or in part within a smaller television market, as defined in § 76.5, shall carry television broadcast signals only in accordance with the following provisions:

(a) Any such cable television system may carry or, on request of the relevant station licensee or permittee, shall carry the signals of:

(1) Television broadcast stations within whose specified zone the community of the system is located, in whole or in part;

(2) Noncommercial educational television broadcast stations within whose Grade B contours the community of the system is located, in whole or in part;

(3) Commercial television broadcast stations licensed to communities in other smaller television markets within whose Grade B contours the community of the system is located, in whole or in part;

(4) Television broadcast stations licensed to other communities which are generally considered to be part of the same smaller television market (Example: Burlington, Vermont-Plattsburgh, New York television market);

(5) Television translator stations, with 100 watts or higher power, licensed to the community of the system;

(6) Commercial television broadcast stations that are significantly viewed in the community of the system. See § 76.54.

36 F.C.C.2d at 230–31. Under these rules, CCC may have been required to carry Midland's signal. Resolution of this point depends on certain factual questions which are best resolved on remand.

its business judgment. Ordinarily, the cable company might base its decision on a variety of business reasons including the station's broadcast offerings or the projected viewing preferences of the cable's subscribers. As the Supreme Court has recognized, the mere fact that a business decision is subject to a degree of regulatory control does not automatically result in an antitrust immunity. *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973). In this case, CCC has not demonstrated how FCC regulation interfered with the exercise of its business judgment with respect to the decision whether to carry Midland's signal. The regulations did not prohibit carriage of the signal, and, indeed, may have required it. CCC's refusal was not therefore compelled by federal regulation. Accordingly, no repugnancy exists between the FCC carriage rules and antitrust principles. If the refusal violated antitrust laws, a finding of liability would not undermine or conflict with the regulatory scheme. Given the FCC's policy to promote UHF broadcasting, the regulatory and antitrust principles are, in fact, complementary.

In holding that FCC carriage rules did not operate to create an antitrust immunity for CCC's refusal to carry Midland's signal, we are guided by the Supreme Court's decision in *United States v. RCA*, 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959). In *RCA*, the United States brought suit alleging that RCA violated the antitrust laws by coercing another company to exchange television stations with it. RCA defended on the ground that the exchange had been considered and approved by the FCC. The Court held that neither the general provisions of the Communications Act nor the specific actions of the FCC served to create an antitrust immunity for the acts complained of by the government. "Thus, the legislative history of the Act reveals that the Commission was not given the power to decide antitrust issues as such, and that Commission action was not intended to prevent enforcement of the antitrust laws in federal courts." *RCA, supra*, 358 U.S. at 346, 79 S.Ct. at 464. Indeed, numerous courts have refused to imply antitrust immunity in a number of factual circumstances involving federal regulation over the communications industry. *See, e. g., Mid-Texas Communications, supra*, 615 F.2d at 1377; *Essential Communications Systems, Inc. v. AT&T*, 610 F.2d 1114, 1116–24 (3d Cir. 1979); *International Telephone & Telegraph Corp. v. General Telephone & Electronics Corp.*, 518 F.2d 913, 934 (9th Cir. 1975); *Jarvis, Inc. v. AT&T*, 481 F.Supp. 120, 123 (D.D.C.1978); *MCI Communications Corp. v. AT&T*, 462 F.Supp. 1072, 1089–96 (N.D.Ill.1978); *United States v. AT&T*, 461 F.Supp. 1314, 1320–30 (D.D.C. 1978).[9]

Appellees argue that before Midland's signal could be added to the cable it was necessary for CCC to file a statement with the FCC, and that this filing procedure acted to create an antitrust immunity. The argument is without merit. Under the 1966 Rules, CCC only had to notify the station and the FCC of its intention to add the signal. While the 1972 Rules required the

---

**9.** Appellees seek to distinguish *RCA* on the ground that in that case the Supreme Court was considering antitrust immunity within the confines of the FCC's regulatory authority under Title III of the Communications Act concerning regulation of broadcasting whereas FCC authority over cable televisions arises from Title I of the Act. This argument is incorrect. First, the Supreme Court decisions in *United States v. Southwestern Cable Co.*, 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968), and *FCC v. Midwest Video Corp.*, 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979), hold that while the FCC general authority over cable broadcasting arises from Title I, its specific authority is exercised in conjunction with its authority over broadcasting under Title III. As such, the *RCA* decision is directly relevant. Moreover, appellees have failed to demonstrate the significance of a holding that FCC authority arises under Title I. Cases concerning Title II and the FCC's regulation over common carriers have also refused to find antitrust immunities. See, e. g., *Mid-Texas Communications Systems, Inc. v. AT&T*, 615 F.2d 1372 (5th Cir. 1980); *MCI Communications Corp. v. AT&T*, 462 F.Supp. 1072, 1078–1084 (N.D.Ill.1978). Accordingly, since the issue is not relevant to our ultimate determination, we need not resolve whether the question of antitrust immunity must be considered within the confines of Title I or Title III.

FCC to issue a certificate of compliance prior to CCC being able to add the signal, there is no indication that this procedure was onerous or that the FCC would refuse certification.[10] In essence, the certification requirement was analogous to a licensing requirement. The *RCA* decision makes clear that the FCC's licensing power does not, in and of itself, confer antitrust immunity. *RCA, supra*, 358 U.S. at 348–52, 79 S.Ct. at 466–68.

■ Appellees also argue that they should not be subject to antitrust liability given the fact that Midland could have brought an action before the FCC to compel carriage. This contention is also without merit. There is no requirement that an antitrust plaintiff exhaust administrative remedies as a prerequisite to bringing an antitrust suit. *Mid-Texas Communications, supra*, 615 F.2d 1380 (plaintiff permitted to prosecute antitrust action for wrongful failure of telephone company to interconnect its long-distance facilities despite existence of procedure under Communications Act whereby plaintiff could have compelled interconnection). *See RCA, supra*, 358 U.S. at 352, 79 S.Ct. at 468; *Carnation, supra*, 383 U.S. at 224, 86 S.Ct. at 787–88.

In light of the fact that FCC regulation of carriage access for cable broadcasting did not conflict with antitrust principles in the context of CCC's decision to carry Midland's signal, there is no justification for holding that appellees have antitrust immunity. Accordingly, the judgment must be reversed and the case remanded for trial.

REVERSED AND REMANDED.

10. The FCC description of the procedure indicates the pro forma nature of the certificate requirement:

Absent special situations or showings, requests consistent with our rules will receive prompt certification. The rules will operate on a "go, no-go" basis—i. e., the carriage rules reflect our determination of what is, at this time, in the public interest with respect to cable carriage of local and distant signals. We will, of course, consider objections to signal carriage applications and have retained special relief rules, but those seeking signal carriage restrictions on otherwise permitted signals have a substantial burden. Before restrictions are imposed in such cases, there will have to be a clear showing that the proposed service is not

consistent with the orderly integration of cable television service into the national communications structure and that the results would be inimical to the public interest. We have during the course of this proceeding fully considered the question of impact on local television service and we do not expect to re-evaluate that general question in individual cases. And, for the same reason, we have no intention of re-evaluating on request of cable systems in individual proceedings the general questions settled in our carriage and exclusivity rules. Rather, we strongly believe that cable systems must generally operate under these rules and that, only after meaningful experience, will we be in position for a general reassessment. 2 F.C.C.2d at 186–87.