**BRANCH BANKING AND TRUST COMPANY, Plaintiff–Appellee**

v.

**Richard PRICE, Defendant–Appellant.**

No. 12–60466.

United States Court of Appeals, Fifth Circuit.

March 22, 2013.

James William Shelson, Benjamin Lyle Robinson, Esq., Luther T. Munford, Phelps Dunbar, L.L.P., Jackson, MS, for Plaintiff–Appellee.

Robert Smith Murphree, Esq., Jackson, MS, for Defendant–Appellant.

Before DeMOSS, OWEN, and HAYNES, Circuit Judges.

PER CURIAM: *

Richard Price ("Price") appeals the district court's grant of summary judgment in favor of Branch Bank and Trust Company ("the Bank") holding him liable under the parties' Limited Guaranty Agreement ("LGA") for the obligations of Orleans Furniture, Inc. ("OFI"). We AFFIRM.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In April 2006, the Bank and OFI entered into a Factoring and Security Agreement ("FSA"). The FSA generally provided that the Bank would purchase and credit-insure certain receivables of OFI and pay OFI what it received upon payment of the accounts, less a discount. In addition, the FSA provided that OFI could use uncollected receivables to secure loans—i.e., "Advances"—from the Bank. OFI and the Bank also entered into an Inventory Rider agreement, which provided that OFI could acquire loans from the Bank—i.e., "Inventory Advances"—secured by OFI's inventory. OFI and the Bank signed the Inventory Rider simultaneously with the FSA and specifically incorporated it therein. When OFI and the Bank later modified the Inventory Rider, Price signed the amendment in his capacity as a guarantor.

In March 2007, the Bank and OFI's shareholders entered into the LGA, through which OFI's shareholders guaranteed OFI's obligations to the Bank. The Bank drafted the LGA. In October 2007, the Bank, OFI, and the guarantors who had signed the LGA entered into a forbearance agreement after OFI defaulted under the FSA. After the parties entered into two amended forbearance agreements, the Bank alleged that OFI also defaulted under the forbearance agreement. The Bank sought recompense from each of the guarantors. Apart from Price, all of the guarantors eventually satisfied their obligations under the LGA.

The Bank sued Price, and both parties moved for summary judgment. The district court granted the Bank's motion and ruled that Price's motion was moot. The district court entered final judgment against Price in the amount of $271,432.95, plus costs, interest, and attorneys' fees.

## II. STANDARD OF REVIEW

We review a grant of summary judgment *de novo*, applying the same standard as the district court. *Gen. Universal Sys. v. HAL, Inc.*, 500 F.3d 444, 448 (5th Cir. 2007). Summary judgment is appropriate if the moving party can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a). The evidence must be viewed in the light most favorable to the non-moving party. *United Fire & Cas. Co. v. Hixson Bros.*, 453 F.3d 283, 285 (5th Cir.2006).

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

## III. DISCUSSION

### A. Price's Liability Under the LGA

The LGA is governed by North Carolina's general law of contracts, which provides that "[i]f the language of a contract is clear and only one reasonable interpretation exists, the courts must enforce the contract as written and cannot, under the guise of interpretation, rewrite the contract or impose [terms] on the parties not bargained for and found within the contract." *Crider v. Jones Island Club, Inc.*, 147 N.C.App. 262, 554 S.E.2d 863, 866 (2001) (citation and internal quotation marks omitted); *see also Tripps Rests. of N.C., Inc. v. Showtime Enters., Inc.*, 164 N.C.App. 389, 595 S.E.2d 765, 768 (2004) (citation omitted). An ambiguous contract, however, is construed against the drafter or the drafting party. *Clement Bros. v. N.C. Dep't of Admin.*, 57 N.C.App. 497, 291 S.E.2d 908, 910 (1982). A contract is ambiguous if it "is fairly and *reasonably* susceptible to either of the constructions asserted by the parties." *Glover v. First Union Nat'l Bank of N.C.*, 109 N.C.App. 451, 428 S.E.2d 206, 209 (1993)(emphasis added).

Here, the LGA limits Price's liability by providing that

> [i]n no event ... shall [Price's] liability under this Guaranty exceed a sum equal to ... [18.17%] of the total amount by which Funds Employed [as that term is defined in the Factoring and Security Agreement between Debtor and BB & T] exceeds ninety-five percent (95%) of the gross amount of all Accounts [defined term under the Factoring Agreement] outstanding on the books of BB & T (the [18.17%] figure being [Price's] percentage ownership of [OFI] ...).[1]

(fourth and fifth sets of brackets in original).

Calculating the amount for which Price is liable under this limitation of liability requires considering the definition of "Funds Employed" in the FSA. The term Funds Employed—which is also relevant in calculating OFI's interest payments—refers to: "the gross amount of all Accounts outstanding on the books of [the Bank] less any Reserve Account balance outstanding to the credit of [OFI]." Further, when calculating the "Reserve Account," the Bank "shall credit [the Reserve Account] with the gross amount of each Account purchased by it from [OFI]" and "may debit [the Reserve Account] with the following: all Advances ... and any or all of the Obligations." Based on the FSA, an Account has the same "meaning given to 'account' in the UCC and shall include any right of [OFI] to payment for Goods sold, leased, licensed, assigned or otherwise disposed of or for services rendered...." An "Obligation":

> shall mean *all loans, indebtedness, liabilities, debit balances, covenants, and duties at any time owed by [OFI] to [the Bank]*, or to an Affiliate of [the Bank] (whether or not evidenced by any note or other Instrument and whether or not for the payment of money), direct or indirect, absolute or contingent, joint or several, now existing or hereafter arising, whether arising under [the FSA], or otherwise.

(emphasis added).

Our consideration of these terms leads us to reject Price's unreasonable interpretation that the Bank created a "nonsensical" guaranty and conclude that the dis-

---

1. Initially, Price's share of the liability was 17.44% but following an amendment to the LGA, Price's share of the liability increased to 18.17%.

trict court appropriately interpreted the parties' agreement.[2]

### 1. Inclusion of Inventory Advances in Funds Employed

■ Price contends that he never agreed to be liable for the Inventory Advances made pursuant to the Inventory Rider because they are not included in the FSA's definition of Funds Employed. As the Bank correctly suggests, however, the plain-language definition of Obligations in the FSA—which encompasses "all loans, indebtedness, liabilities, debit balances, covenants, and duties at any time owed by [OFI] to [the Bank, which] ... aris[e] under th[e FSA], or otherwise"—includes Inventory Advances because they constitute a debt owed by OFI to the Bank. Because Inventory Advances fall within the definition of Obligations, they become part of the Reserve Account calculation, which is used in calculating the Funds Employed. Because Funds Employed consists of the liabilities guaranteed by Price in the LGA, a plain reading of the contract illustrates that Price agreed to be liable for the Inventory Advances.

Additionally, the FSA and the Inventory Rider were executed on the same day in April 2006, and the Inventory Rider specifically states that it is "hereby made a part of and incorporated into th[e FSA]." Price also signed an amendment to the Inventory Rider in March 2008 in his capacity as guarantor. The district court did not err in concluding that the Bank's approach, which holds Price liable for the Inventory Advances, serves as the only reasonable interpretation of the LGA provided by the parties.

### 2. The Phrase "to the Credit of [OFI]" in the FSA

■ The FSA provides that Funds Employed equals "the gross amount of all Accounts outstanding on the books of [the Bank] less any Reserve Account balance outstanding *to the credit of [OFI]*." (emphasis added). Price reads the phrase "to the credit of [OFI]," to mean that when the Reserve Account is a negative number it is excluded from the Funds Employed definition because "to the credit of [OFI]" denotes that the account retains a positive value. Effectively, this approach interprets the term "credit" as "credit balance," meaning that when there is a credit in the Reserve Account, that amount is subtracted from the Accounts, but when there is a debit (negative amount) in the Reserve Account, that figure is ignored.

Price is correct that Funds Employed should be offset by a positive balance in the Reserve Account for purposes of his guaranty. It does not follow, however, that a negative balance in the Reserve Account is ignored. Indeed, as the Bank suggests, the phrase "to the credit of [OFI]" refers to the Reserve Account balance "attributable to" OFI and does not describe whether the account has a positive or negative balance. As such, the calculation of Funds

---

**2.** Contrary to Price's suggestion, the affidavit of the Bank's Senior Vice President and certain financial statements do not constitute inadmissible parol evidence. North Carolina's "parol evidence rule prohibits the admission of parol evidence to vary, add to, or contradict the terms of an integrated written agreement." *Drake v. Hance,* 195 N.C.App. 588, 673 S.E.2d 411, 413 (2009) (citation and internal quotation marks omitted); *see also Carolina First Bank v. Stark, Inc.,* 190 N.C.App. 561, 660 S.E.2d 641, 646 (2008) (explaining that parol evidence includes "extrinsic evidence of agreements or understandings *contemporaneous with or prior to execution of* a written instrument" (emphasis added) (citation and internal quotation marks omitted)). Here, the district court did not rely on the affidavit or financial statements to vary, add to, or contradict the LGA. We discern no reversible error in the district court's consideration of this evidence.

Employed must take into account the Reserve Account's balance regardless of its positive or negative value.

Further, Price's interpretation of the phrase "to the credit of [OFI]" is an unreasonable interpretation when used to calculate OFI's interest payments. Funds Employed serves as the basis for calculating the amount on which OFI pays interest. Under Price's view, when the Reserve Account balance is negative and therefore not considered, OFI would essentially pay interest only on the Accounts—i.e., the accounts receivable purchased by the Bank—and not on the loans, advances, and other obligations that are encompassed by the Reserve Account. Such a result does not present a reasonable interpretation of the agreement.

Accordingly, we conclude that, in calculating Funds Employed, the Accounts owned by the Bank are to be offset by balances in OFI's Reserve Account, regardless of whether it carries a positive or negative balance. Because this approach represents the only reasonable interpretation of the phrase presented to us, the district court did not err in adopting it.

### 3. The LGA's Use of the Term Accounts

We further reject Price's argument that the LGA is "nonsensical" because the limitation of liability provision relies on the term Accounts "on the front and back end of the formula" calculating liability, thereby creating the "astonishing result" that Price is liable for nothing because the value of Accounts will never exceed 95% of Accounts. In fact, the LGA relies on Accounts three times when calculating Price's liability. The definition of Funds Employed relies on Accounts twice—it is initially part of the Reserve Account calculation and is subtracted during the calculation of Funds Employed from the Reserve Account. As the Bank observes, these two uses of Accounts in the calculation of Funds Employed cancel themselves out, thereby effectively leaving Funds Employed to equal OFI's Obligations. The LGA's limitation of liability provision then uses Accounts a third time by subtracting Accounts from the Funds Employed. Indeed, this third use of the term Accounts benefits Price. It allows for the amount for which he is liable to reflect the assets—the Accounts (accounts receivable)—already in the Bank's possession.

The extent of Price's argument on this point is to claim that the formula creates "problems and inconsistencies." He does not present an alternative reasonable interpretation of the agreement. Again, the Bank's approach is the only reasonable interpretation presented by the parties, and we therefore conclude the district court did not err in adopting it.

### 4. Extent of the Guarantors' Liability

█ Price further argues that the district court's interpretation of the LGA did not take into account the reduction in the amount of liability when other guarantors paid their share of the debt covered by the LGA. In other words, he suggests that his obligation is not 18.17% of the total guaranteed debt under the LGA at the time the Bank initially demanded payment, but rather 18.17% of the remaining balance due under the LGA after subtracting the amounts paid by other guarantors.

This view does not comport with the LGA's plain language. In the LGA, Price agreed to be liable for 18.17% "of the total amount by which Funds Employed ... exceeds ninety-five percent (95%) of the gross amount of all Accounts." This definition of liability does not contemplate the approach advanced by Price. Further, as the Bank points out, Price's interpretation would leave 14.87% of the debt unpaid and

would provide a windfall for Price based on his decision to hold out and refuse to pay the debt until a judgment was entered against him. Price's approach creates a perverse incentive in which no guarantor would want to pay until all other guarantors have paid their share and reduced the amount due. Such an approach is not supported by the plain language of the LGA.

## B. Award of Attorneys' Fees

■ In addition to properly interpreting Price's liability under the LGA, the district court committed no error in awarding the Bank $37,829.84 in attorneys' fees.[3] A party seeking attorneys' fees must provide notice of its intent to enforce the parties' agreement "relative to payment of attorneys' fees" and inform the obligor that he or she "has five days from the mailing of such notice to pay the 'outstanding balance' without the attorneys' fees." N.C. Gen.Stat. § 6–21.2(5). Without proper notice, a lender cannot recover attorneys' fees. *See McGinnis Point Owners Ass'n v. Joyner*, 135 N.C.App. 752, 522 S.E.2d 317, 320 (1999).

The Bank provided notice to Price on two occasions over the span of five months. First, the Bank wrote to Price in September 2010 to "demand ... payment in accordance with your LGA of the amount of $219,767.21." In this letter, the Bank informed Price that it "may collect its reasonable attorneys fees and costs if legal enforcement action is necessary." In January 2011, the Bank wrote Price again and informed him that he had "ten (10) business days from the date of this letter to pay this debt or [it] intend[ed] to file suit against [him] for [$251,546.71], ... plus all court costs and attorneys' fees." This latter correspondence in particular satisfies the Bank's notice obligation by explaining that Price could pay the current balance due—which excludes attorneys' fees—within ten days or that suit would be filed against him and he would be responsible for attorneys' fees. Accordingly, the Bank complied with the notice requirement of section 6–21.2(5).

Further, the Bank did not need to provide additional evidence establishing the reasonableness of the fees. When a contract does not establish the percentage of attorneys' fees to be awarded, section 6–21.2(2) provides that the attorneys' fees "provision shall be construed to mean fifteen percent (15%) of the 'outstanding balance' owing on said note, contract or other evidence of indebtedness." Section 6–21.2(3) defines outstanding balance as "the principal and interest owing at the time suit is instituted to enforce any security agreement securing payment of the debt and/or to collect said debt." Here, the district court awarded the Bank $37,829.84 in attorneys' fees, which was 15% of the amount of outstanding liability guaranteed by Price at the time of the complaint.[4]

---

3. Prior to awarding attorneys' fees, the district court entered a judgment against Price in the amount of $271,432.95, the sum he guaranteed pursuant to the LGA plus interest. Before the district court, Price did not contest the Bank's calculation of the amount of liability based on the Bank's interpretation of the LGA. Further, during oral argument on appeal, Price's counsel did not contest the district court's calculation of the *amount* of liability as calculated based on the Bank's interpretation of the agreement. Instead, coun-

sel only took issue with the Bank's interpretation of the agreement. Accordingly, Price has waived any argument that a fact issue existed concerning the amount of liability based on the Bank's interpretation of the LGA. *See Yohey v. Collins*, 985 F.2d 222, 224–25 (5th Cir.1993).

4. Although some courts have required that "[a]n award of attorneys' fees under [section 6–21.2] must be supported by evidence and findings of fact showing the reasonable-

Therefore, we find no error in the district court's award of attorneys' fees.

## IV. CONCLUSION

The district court reasonably interpreted the LGA and did not err in its award of attorneys' fees.[5] Accordingly, we AFFIRM.

ness of the award," *e.g., Barker v. Agee,* 93 N.C.App. 537, 378 S.E.2d 566, 570 (1989), *aff'd in relevant part, rev'd on other grounds,* 326 N.C. 470, 389 S.E.2d 803 (1990), additional evidence of the reasonableness of the fees need not be presented when the record before the trial court demonstrates the work performed by trial counsel and illustrates the reasonableness of the fees sought, *see Inst. Food House, Inc. v. Circus Hall of Cream, Inc.,* 107 N.C.App. 552, 421 S.E.2d 370, 374 (1992). Here, the district court had before it the pleadings, depositions, motions for summary judgment, and other attorney work product that sufficiently illustrated the efforts expended by the Bank's attorneys in successfully securing a judgment against Price.

5. In light of our *de novo* review of the district court's decision, it is not necessary to address whether the district court reversibly erred by inserting portions of the Bank's briefs into its memorandum opinion. While we generally discourage district courts from relying heavily on a party's brief "since it leaves [us] with doubt concerning the actual basis of the trial judge's decision," *Midland Telecasting Co. v. Midessa Television Co.,* 617 F.2d 1141, 1144 n. 5 (5th Cir.1980), a district court's task in deciding summary judgment is to make conclusions of law, not findings of fact, that we review *de novo, see Gen. Universal Sys.,* 500 F.3d at 448. Here, our *de novo* review of the district court's grant of summary judgment has led us to the same result reached by the district court.