**COMMONWEALTH OF PENNSYLVANIA, ex rel. LeRoy S. ZIMMERMAN, Attorney General of Pennsylvania, Plaintiff,**

v.

**PEPSICO, INC., Allegheny Pepsi-Cola Bottling Co., Inc., and Confair Bottling Co., Inc., Defendants.**

Civ. A. No. 86–1799.

United States District Court, M.D. Pennsylvania.

April 28, 1987.

---

Eugene F. Waye, Carl S. Hisiro and Kelly H. Greensmith, Deputy Attys. Gen., Office of Atty. Gen., Antitrust, Harrisburg, Pa., for Com.

Gerard W. Casey, Purchase, N.Y., Rod J. Pera, Alan R. Boynton, Jr., McNees, Wallace and Nurick, Harrisburg, Pa., for Pepsico, Inc. & Allegheny Pepsi Cola Bottling Co.

J. David Smith, McCormick, Reeder, Nichols, Sarno Bahl & Knecht, Williamsport, Pa., Fred A. Freund, Richard M. Steuer, Kaye, Scholer, Fierman, Hays & Handler, Hughes Hubbard & Reed, James B. Reed, New York City, for Confair Bottling Co.

## MEMORANDUM

CALDWELL, District Judge.

### I. *Introduction.*

Defendants, PepsiCo, Inc. (PepsiCo), Allegheny Pepsi-Cola Bottling Company, Inc. (Allegheny) and Confair Bottling Company, Inc. (Confair), have filed motions to dismiss the amended complaint. The Commonwealth of Pennsylvania brought this antitrust action as *parens patriae*, alleging violation of section 1 of the Sherman Act, 15 U.S.C. § 1, and seeking an injunction against certain practices of the defendants pursuant to the Clayton Act, 15 U.S.C. § 26. In ruling upon the motions, we must accept as true all well-pleaded allegations of the complaint and construe them liberally in the light most favorable to the plaintiff. *See Labov v. Lalley,* 809 F.2d 220 (3d Cir.1987).

### II. *Background.*

The amended complaint sets forth the following allegations. PepsiCo manufactures soft drink syrup and concentrate which it sells to, among other bottlers, Allegheny and Confair. The latter defendants have licensing agreements with PepsiCo which authorizes them to produce, package, and sell carbonated Pepsi-Cola soft drinks to so-called "resellers," consisting of beer and soda distributors, restaurants, taverns, bars, vending companies, grocery stores, department stores and drug stores. Allegheny and Confair have been granted exclusive geographic territories in which to sell PepsiCo products.

The complaint charges that the defendants have engaged in a horizontal conspiracy to restrain trade by preventing resellers from making sales of Pepsi-Cola products to each other. Specifically, defendants have engaged in the following practic-

es: (1) using coding systems so that soft drink products can be traced and monitored; (2) fining bottlers for product shipped or sold out of their territory by resellers; (3) refusing to deal with resellers who buy or sell soft drinks outside the territory in which the reseller is located; (4) refusing to deal with resellers which buy or sell soft drinks to or from other resellers located in the same bottling territory; (5) combining with resellers not to sell soft drink to other resellers and threatening to terminate them or limit their supplies if they do so; and (6) limiting sales to quantities a reseller needs solely for its own retail sales.

The complaint alleges that resellers often desire to buy and sell to each other because of price differences between the bottlers and because a bottler may even sell product to different resellers at different prices. When resales are made outside the bottler's territory, it is known as "transhipping" *Pepsi-Cola Metropolitan Bottling Co. Inc. v. Checkers, Inc.*, 754 F.2d 10, 12 (1st Cir.1985).

The basis of the motions to dismiss is that the defendants' arrangement is specifically protected by the Soft Drink Interbrand Competition Act (the Act), 15 U.S.C. § 3501. Conversely, plaintiff asserts that its claim is actually one for which the Act carves out an exception in section 3502. After careful consideration we conclude that the Act does immunize defendants' behavior under section 3501 and that the section 3502 exception does not apply.

III. *Discussion.*

The relevant statutory sections are as follows:

§ 3501. Exclusive territorial licenses to manufacture, distribute, and sell trademarked soft drink products; ultimate resale to consumers; substantial and effective competition Nothing contained in any antitrust law shall render unlawful the inclusion and enforcement in any trademark licensing contract or agree-

ment, pursuant to which the licensee engages in the manufacture (including manufacture by a sublicensee, agent, or subcontractor), distribution, and sale of a trademarked soft drink product, of provisions granting the licensee the sole and exclusive right to manufacture, distribute, and sell such product in a defined geographic area or limiting the licensee, directly or indirectly, to the manufacture, distribution, and sale of such product only for ultimate resale to consumers within a defined geographic area: Provided, That such product is in substantial and effective competition with other products of the same general class in the relevant market or markets.

15 U.S.C. § 3501.

§ 3502. Price fixing agreements, horizontal restraints of trade, or group boycotts Nothing in this Act shall be construed to legalize the enforcement of provisions described in section 2 of this Act [15 USC § 3501] in trademark licensing contracts or agreements described in that section by means of price fixing agreements, horizontal restraints of trade, or group boycotts, if such agreements, restraints, or boycotts would otherwise be unlawful.

15 U.S.C. § 3502 (brackets added).

As detailed in defendants' brief in support of their motions, this legislation was passed after years of litigation before the Federal Trade Commission which ultimately culminated in an FTC decision that the syrup manufacturers' territorial system, a common practice in the industry for seventy-five years, violated section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1). *See Coca-Cola Co. v. FTC*, 207 D.C.App. 1, 642 F.2d 1387 (D.C.Cir.1981) (per curiam) (declining to exercise appellate review of the FTC's decisions involving the Coca-Cola Co. and Pepsico and, based upon passage of the Act after the FTC decisions, remanding them to the FTC solely for dismissal of the administrative complaints).[1]

---

1. We should note that the court of appeals did not reach the merits of whether the practices investigated by the FTC were lawful under the

Act. It merely remanded for dismissal because both sides requested such relief. It expressly

■ We agree with defendants that, standing alone, section 3501 would make lawful the practices alleged in the amended complaint. The section broadly provides that the antitrust laws shall not apply to any trademark licensing agreement *limiting the licensee directly or indirectly* to the manufacture, distribution and sale of such product *only for ultimate resale to consumers in a defined geographic area.* In the instant case, this section would allow PepsiCo to limit its bottlers to sales of product to those who, in turn, would sell only to the ultimate consumer. Section 3501 would thus make lawful the practices the Commonwealth has complained about; chiefly, the refusal by both bottlers to sell to resellers—those businesses, inside or outside the territory, which would sell not just to the consumer, but to other retailers as well. We agree with defendants that to accept plaintiff's interpretation of the Act—that the Act does not protect limitations imposed upon resellers—would render the Act meaningless.

As noted by defendants, the practices challenged here by the Commonwealth have been found lawful when considered under a rule of reason analysis. For example, in *Sports Center, Inc. v. Riddell, Inc.,* 673 F.2d 786 (5th Cir.1982), a dealer sued Riddell, a manufacturer of football helmets, after the dealer was terminated for "bootlegging" helmets to other retailers. Riddell required its dealers to sell only to ultimate consumers. The jury found in favor of Riddell. Approving of the practice on appeal, the court stated:

> In short, Riddell was entitled to impose and enforce a *reasonable* anti-bootlegging policy. This type of restriction and enforcement "is not equivalent to conspiracy." *Parsons v. Ford Motor Co.,* 669 F.2d 308, at 313 [ (5th Cir.1982) ] (footnote omitted). Considering Riddell's business reasons for limiting its products distribution to authorized dealers—products liability consequences and improving its competitive position in the market—in combination with its legal right to terminate a retailer, *see Burdett Sound, Inc.*

avoided deciding whether, under the standard

*v. Altec Corp.,* 515 F.2d 1245 (5th Cir. 1975), we conclude that the district court's direct-verdicts and post-judgment decrees were not in error.

*Id.* at 791–92 (footnote omitted).

This practice corresponds to PepsiCo's ban on sales to resellers or transhippers.

In another case dealing directly with the soft drink industry and with the problem of transhipping, *Pepsi-Cola Metropolitan Bottling Co., supra,* the court concluded that the Act permitted a bottler to limit its sales to a retailer to prevent the retailer from reselling the product at wholesale. The court stated:

> To be sure, Randolph [the transhipper] asserts in mitigation of his conduct that Pepsi and Metropolitan [the bottler] were themselves guilty of unfair and wrongful conduct in refusing to sell to his company all the product it desired. Defendants contend that since appellee engaged in questionable practices with respect to defendants, defendants' retaliatory refusal to pay a preexisting debt was not immoral, unethical, oppressive or unscrupulous. However, to the extent there was any question whether Pepsi-Cola, Inc. and Metropolitan were entitled to limit sales so as to maintain Pepsi's system of exclusive territorial dealerships, their right to do so was bolstered by the Soft Drink Interbrand Competition Act, 15 U.S.C. § 3501, which became effective July 9, 1980, less than three weeks after Randolph first refused to pay. *See Coca-Cola v. FTC,* 642 F.2d 1387 (D.C.Cir. 1981). By the time Randolph deliberately withheld payment, the handwriting was on the wall in this regard.

754 F.2d at 18 (brackets added).

The same result was reached before passage of the Act in *Tomac, Inc. v. Coca-Cola Company,* 418 F.Supp. 359 (C.D.Cal. 1976). There, the court set aside a jury verdict in favor of the plaintiff which had charged the Coca-Cola Company with antitrust violations for refusing to provide plaintiff's bottler sufficient syrup so that the plaintiff could sell to retailers in other bottlers' territories. Noting that the ar-

set forth in the Act, the practices were legal.

rangement plaintiff was attacking was a vertical one rather than horizontal and thus subject to a rule of reason analysis, the court concluded that the exclusive territorial restriction placed upon the bottler was reasonable and promoted a legitimate business purpose by giving the bottler an incentive to invest in plant and equipment. *See also First Beverages, Inc. v. Royal Crown Cola Co.*, 612 F.2d 1164 (9th Cir.), *cert. denied*, 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980).

Similarly, in *Davis-Watkins Company v. Service Merchandise*, 686 F.2d 1190 (6th Cir.1982), *cert. denied sub nom., Service Merchandise v. Amana Refrigeration, Inc.*, 466 U.S. 931, 104 S.Ct. 1718, 80 L.Ed.2d 190 (1984), the court affirmed a summary judgment in favor of the manufacturer, Amana Refrigeration, Inc., and one of its distributors, Davis-Watkins Company, on a claim that Amana's exclusive territorial system violated section 1 of the Sherman Act. The restrictions imposed by Amana required distributors to sell only to authorized dealers, the dealers had to be located in the distributor's territory and, most importantly, dealers had to agree to sell only to consumers. Amana enforced its policy by tracking the product, microwave ovens, through its computer system and by offering financial incentives solely to the distributor in whose territory an oven was used rather to the selling dealer or distributor. As a result of this policy, Service Merchandise could no longer obtain Amana microwave ovens for retail sale. The court of appeals concluded that the restrictions were vertically imposed and reasonable, being designed to increase Amana's competitiveness in the interbrand market. Thus, a total ban on transhipping was found to be valid.

■ The amended complaint sets forth two other practices which are used to enforce the ban on resales and transhipments. One is the use of a coding system to trace product to individual bottlers. The other is the imposition of fines on bottlers whose product is shipped or sold out of their territory by resellers. The first practice corresponds to the computer tracking system used in *David-Watkins, supra*, and the second to the financial incentives from the same case. We view these practices as being legal since they are used to enforce a legal ban on resales.

Plaintiff has complained of one practice which would not appear to be protected by section 3501. Resellers have been prevented from selling to other resellers even when it has not been shown that the purchasers had intended to sell the product outside the territory. If the purchaser sells only at retail inside the territory, it could be argued that the ultimate resale to consumers has occurred within the territory and apparently the plan sanctioned by Congress has not been violated.

■ We believe, however, that PepsiCo and the bottlers could legitimately prohibit such sales to control transhipping. For example, in *Bruce Drug, Inc. v. Hollister, Inc.*, 688 F.2d 853 (1st Cir.1982), the plaintiff retailers had obtained a preliminary injunction requiring the defendant manufacturer to continue to supply them with its ostomy appliances. The court of appeals reversed the grant of the injunction, concluding that the refusal to deal was a reasonable response to one of the plaintiff's attempts to sell overseas—a territory belonging to another distributor. Responding to one of plaintiffs' arguments, the court stated:

Bruce contends, very possibly correctly, that by March, 1981, defendant was undertaking to prevent its getting any Hollister products whatever, and asserts this to be an overbroad response. There are two answers to this. One is that Bruce does not suggest how defendant could safely protect itself by doing anything less. While foreign ostomates generally prefer closed pouches, we find nothing in the record to suggest that they use nothing else. It would appear that virtually any box of Hollister products sent to Bruce could, potentially, wind up overseas. Even if not, defendant was not required to adopt the least restrictive means of stopping Bruce from selling abroad, but merely means reasonably suited to that purpose. *American*

*Motor Inns, Inc. v. Holiday Inns, Inc.*, 3 Cir., 1975, 521 F.2d 1230, 1248-50; *see Continental T.V., Inc. v. GTE Sylvania, Inc.*, 1977, 433 U.S. 36, 58 n. 29, 97 S.Ct. 2549, 2561 n. 29, 53 L.Ed.2d 568. Defendant cannot be faulted for failing to engage in elaborate and possible time-consuming speculation about Bruce's marketing intentions on an order-by-order or box-by-box basis. The court having held, quite properly, that defendant was to be held to nothing stricter than a rule of reason, *Continental T.V., Inc. v. GTE Sylvania, Inc.*, ante; *Eastern Scientific Co. v. Wild Heerbrugg Instruments, Inc.*, 1 Cir., 1978, 572 F.2d 883, *cert. denied*, 439 U.S. 833, 99 S.Ct. 112, 58 L.Ed.2d 128, we see no basis for finding that it violated that standard.

*Id.* at 860.

Buying from another distributor or wholesaler to circumvent the direct refusal to deal by the manufacturer appears to be a common practice. *See Davis-Watkins, supra; Mendelovitz v. Adolph Coors Co.*, 693 F.2d 570 (5th Cir.1982). In turn, manufacturers have responded by cutting off the distributor selling to the transhipper or limiting sales to the distributor's legitimate needs. We conclude that the practice of discouraging sales between resellers is reasonably designed to control transhipping and sanctioned by the Act.

Our conclusion is buttressed by paragraph 19 of the amended complaint which sets forth the reasons why resellers attempt to purchase from other resellers:

Resellers buy from other resellers because their local bottler charges higher prices. Resellers also buy from each other when their local bottler either refuses to sell Pepsi products to them or refuses to sell Pepsi products to them in sufficient quantities.

The first sentence refers to purchases attempted from resellers in another territory. Under the Act, defendants clearly are authorized to prevent this practice. The second sentence refers to purchases from resellers in the same territory. Specifically, the practice is attempted because the local bottler refuses to supply the reseller at all

or sells the reseller insufficient quantities. As defendants correctly point out, "if the factual context renders [a] claim implausible—if the claim is one that simply makes no economic sense—[plaintiff] must come forward with more persuasive evidence to support [its] claim than would otherwise be necessary. *Matsushita Electric Industrial Co. v. Zenith Radio Corporation*, 475 U.S. .574, ——, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986) (brackets added). Plaintiff's claim makes no economic sense. No bottler would refuse to sell to a reseller in the bottler's own territory, or to limit the reseller's supply—unless it was trying to prevent transhipment, in which case the restraint is reasonable and in conformity with the Act. Moreover, plaintiff has not argued presuasively that defendants had any other motive. The bottlers' motive is ostensibly to eliminate competition from resellers in the retail market. But, as we have seen, as between and among territories, the Act authorizes such activity in furtherance of PepsiCo's vertical marketing scheme. And, within a territory, a bottler controls sales and it would make no sense to withhold product which would eventually be sold in its own territory and from which it would profit.

Plaintiff has not attempted to rebut the use of any of the above cases or others cited by defendants. It does not claim that any of them are in error or distinguishable on their facts. Rather, relying principally upon *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164 (3d Cir.1979), the Commonwealth contends that defendants' cases are simply irrelevant to its claim which is for a *per se* illegal horizontal conspiracy, not a vertical arrangement, among the defendant bottlers and PepsiCo. The plaintiff also asserts that the defendants' refusal to deal with resellers is a group boycott, another *per se* violation of the Sherman Act. *See Cernuto, supra.* Finally, plaintiff cites section 3502 of the Act which excepts from the protection of section 3501 enforcement of trademark licensing provisions by way of price fixing agreements, horizontal restraints of trade or group boycotts.

Plaintiff's reliance upon *Cernuto, supra,* and cases like it, is misplaced. In those cases, the restraint was instigated by the dealers, not the manufacturer at the top of the distribution chain. Thus, for example, in *Cernuto,* plaintiff, a retailer of kitchen cabinets, claimed it was terminated as a dealer by the defendant manufacturer after receiving complaints from another retailer about plaintiff's discount prices. The district court entered summary judgment against plaintiff. Reversing, the court of appeals made a distinction between an apparently vertical restraint and one which was really horizontal in nature. The court stated:

> [I]f the action of a manufacturer or other supplier is taken at the direction of its customer, the restraint becomes primarily horizontal in nature in that one customer is seeking to suppress its competition by utilizing the power of a common supplier.
>
> Therefore, although the termination in such a situation is, itself, a vertical restraint, the desired impact is horizontal and on the dealer, not the manufacturer, level.

*Id.* at 168 (brackets added).

The court commented on *United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966), another case cited by plaintiff in its support, as follows:

> The importance of the horizontal nature of this arrangement is illustrated by *United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). Although General Motors, the manufacturer, was seemingly imposing vertical restraints when it pressured recalcitrant automobile dealers not to deal with discounters, the Supreme Court noted that in fact these restraints were induced by the dealers seeking to choke off aggressive competitors at their level, and found a *per se* violation, rejecting the suggestion that only unilateral restraints were at issue. So here, if United and Lappin acted at Famous' direction, both the purpose and effect of the termination was to eliminate competition at the retail level, and not, as in *GTE Sylva-*

*nia,* to promote competition at the manufacturer level. Accordingly, the pro-competitive redeeming virtues so critical in *GTE Sylvania* may not be present here.

*Id.* (footnote omitted).

The plaintiff also cites *Malley-Duff & Associates, Inc. v. Crown Life Insurance,* 734 F.2d 133 (3d Cir.), *cert. denied,* 469 U.S. 1072, 105 S.Ct. 564, 83 L.Ed.2d 505 (1984), which presented a similar factual situation. In *Malley-Duff,* the court of appeals, relying upon *Cernuto,* reversed a grant of a directed verdict in favor of defendant because the plaintiff insurance agency had alleged an agreement by its competitors in the insurance industry, aided by an insurance company, to exclude it from the market.

▋ The situation in the instant case is materially different. The practices plaintiff complains about have been a part of the soft-drink industry for over seventy-five years and were imposed by the licensors, including PepsiCo. *See In re the Coca-Cola Company,* 91 F.T.C. 517 (1978); *In re PepsiCo., Inc.,* 91 F.T.C. 680 (1978). The Act is a direct result of the adverse decisions the soft-drink companies received from the Federal Trade Commission. It may be "special interest legislation," as plaintiff characterizes it, (plaintiff's brief in opposition to the motion to dismiss at p. 15), and there may be good reasons why plaintiff finds the Act objectionable. Nevertheless, Congress did pass it into law and, as defendants correctly assert, the legislation makes lawful what would otherwise be tested by a rule of reason analysis in litigation. We believe it would be totally unreasonable, given the history of the industry, the history of the Act, and the language of the Act itself, to accept plaintiff's contention that the conduct of the defendants is a horizontal conspiracy inspired by the defendant bottlers.

Contrary to plaintiff's position, section 3502 is not applicable here. There are numerous references in the legislative history to this section but its purpose can be accurately summarized by the following pas-

sage from the House Committee Report dealing with section 3502:

In restating the law applicable to vertically imposed territorial restraints in the soft drink industry, the Committee in no way seeks to address or alter existing proscriptions in the antitrust laws governing territorial restraints that are horizontally inspired or imposed. *United States v. Topco Associates, Inc.*, 405 U.S. 596 [92 S.Ct. 1126, 31 L.Ed.2d 515] (1972). The fact that a particular restraint may appear vertical on its face would not preclude a court from closer analysis revealing hidden horizontal restraints. *United States v. Sealy, Inc.*, 388 U.S. 350 [87 S.Ct. 1847, 18 L.Ed.2d 1238] (1967). Nor should a court overlook the fact that territorial restrictions initially vertically imposed by a manufacturer on his franchisees may with the passage of time take on a dominant horizontal character that brings them within the purview of the per se rule. See *United States v. General Motors Corp.*, 384 U.S. 127, 136 [86 S.Ct. 1321, 1325–26, 16 L.Ed.2d 415] (1966).

Section 3 of the bill [section 3502] ensures that actions constituting per se violations of the antitrust laws are not authorized under the guise of enforcing otherwise valid territoral restrictions. It underlines the Committee's intention that the bill not be used to legalize price fixing agreements, horizontal restraints of trade or group boycotts.

At the Subcommittee hearings, at least one witness testified that the language of H.R. 3567 as introduced might legalize certain horizontal boycotts or other per se violations of the antitrust laws. Section 3 addresses this problem and makes certain that the bill will not legalize per se violations of the antitrust laws. Several examples of per se conduct are listed—price fixing agreements, horizontal restraints of trade, and group boycotts. It is the committee's intent that other conduct deemed by the courts to be per se unlawful also not be authorized by this bill.

The term horizontal restraints of trade is intended to include both primary boycotts and secondary boycotts. The courts have traditionally pierced the veil of supposed vertical restraints that were actually horizontal agreements. Section 2 of this bill in no way protects such agreements.

H.R.Rep. No. 1118, 96th Cong., 2d Sess. 6, *reprinted in* 1980 U.S.Code Cong. & Admin.News 2373, 2377–78 (footnotes omitted) (brackets added).

In all of the cases cited in the Report, the restraint was horizontal, and therefore *per se* illegal, even though, at first blush, it appeared that the restraint was being imposed vertically from above. *General Motors Corp.* has already been accurately summarized above in the quotation from *Cernuto*. *Topco* dealt with the validity of exclusive territories conferred upon individual member supermarkets of a buying cooperative. The cooperative, Topco Associates, had no existence apart from its members. Hence, the court found that there was actually a horizontal conspiracy, a *per se* violation of the Sherman Act. Similarly, *Sealy*, cited by the Court in *Topco*, dealt with a corporation which was entirely owned by its licensees who agreed to maintain exclusive territories. Thus, an apparently vertical restraint was really a horizontal one.

Section 3502 does serve an important purpose. For example, it prevents bottlers from urging upon their licensee the adoption of a restraint which the bottlers desire to impose for anti-competitive purposes. In the absence of section 3502, such a restraint would appear to be vertical and hence protected by section 3501. But, as defendants have correctly noted, plaintiff does not allege that Allegheny and Confair agreed to force PepsiCo to grant exclusive territories upon them. Rather, the territories were conferred upon them by PepsiCo. We also note that the plaintiff has not alleged that the other practices were inspired by the bottlers for their protection. It is irrelevant that the bottlers cooperate in enforcing the territories or complain to PepsiCo when the territories have been violated. *See Davis-Watkins, supra.* The complaint alleges nothing more than a clas-

sic vertical restraint which is protected by the specific provisions of the Act, and we do not believe that we are required to allow this case to proceed on the facts alleged. *See Satellite Financial Planning Corp. v. First National Bank,* 633 F.Supp. 386 (D.Del.1986).

 The only remaining issue is the plaintiff's claim that the defendants have engaged in a group boycott by refusing to deal with resellers who would otherwise sell to other resellers. The effect is to pressure resellers with the goal of excluding resellers from entering the wholesale market for Pepsi-Cola. The short answer to this contention is that the practice is made lawful by the Act. It is a provision, as shown above, which enforces the exclusive territories. Section 3502 does not sanction group boycotts which would "otherwise be unlawful," but, just as plaintiff has failed to allege that the restraints are horizontal rather than vertical, plaintiff has also failed to show that the group boycott was instigated by the bottlers to exclude the resellers from the market.[2]

We will issue an appropriate order.

### ORDER

AND NOW, this 28th day of April, 1987, it is ordered that:

1. Defendants' motions to dismiss are granted and plaintiff's complaint is hereby dismissed.

2. The Clerk of Court shall close this file.

---

[2] Plaintiff argues that defendants have failed to show that this is a trademark licensing agreement protected by the Act. We believe, however, that we can take judicial notice that the agreement at issue in this case is a trademark licensing agreement. *See Coca-Cola Co. v. FTC, supra.*