Dixie J. O'NEILL

v.

The COCA–COLA COMPANY, Coca-Cola Enterprises, Inc., and PepsiCo, Inc.

No. 86 C 7026.

United States District Court, N.D. Illinois, E.D.

Sept. 10, 1987.

Frederic F. Brace, Jr., Kenneth H. Hanson, Law Offices of Frederic F. Brace, Jr., Chicago, Ill., for plaintiff.

Samuel Weisbard, William P. Schuman, McDermott, Will & Emery, Chicago, Ill., William M. Dreyer, W. Thomas Haynes, The Coca-Cola Co., Atlanta, Ga., for defendant The Coca-Cola Co.

Roger Pascal, William M. Hannay, Mark E. Gralen, Schiff, Hardin & Waite, Chicago, Ill., for defendant PepsiCo, Inc.

## MEMORANDUM ORDER

BUA, District Judge.

Before this court are the motions of defendants, The Coca-Cola Company, Inc. and PepsiCo, Inc., to dismiss plaintiff Dixie O'Neill's claims for declaratory and injunctive relief for alleged antitrust injury she, and the class she seeks to represent, will suffer from alleged antitrust violations resulting from defendants' vertical acquisitions of certain bottling facilities. Also before this court is defendant PepsiCo Inc.'s motion to dismiss plaintiff's claim for declaratory and injunctive relief for antitrust injuries allegedly threatened by certain restrictions in PepsiCo Inc.'s distribution policies affecting the resale of PepsiCo Inc. products. For the reasons stated herein, both defendants' motions are granted

and plaintiff's claims are dismissed in their entirety.

## I. *Background*

On January 24, 1986, PepsiCo, Inc. ("PepsiCo") announced an agreement with Philip Morris Incorporated to purchase The Seven-Up Company's ("Seven-Up") national and international carbonated soft drink business. On February 20, 1986, The Coca-Cola Company ("Coca-Cola") announced that it had agreed to acquire Dr. Pepper, Inc. ("Dr. Pepper"). Five days later, plaintiffs Louis Klein, Arthur Slavin, and Caroline Corley filed a complaint in the United States District Court for the Northern District of Illinois alleging that the proposed Coca-Cola and PepsiCo acquisitions of Dr. Pepper and Seven-Up, respectively, violated Sections 1 and 2 of the Sherman Act and Section 7 of the Clayton Act, 15 U.S.C. §§ 1, 2, and 18. The case was assigned to Judge Brian Barnett Duff.

On June 19, 1986, the Royal Crown Cola Co. ("Royal Crown") filed a complaint in the United States District Court for the Middle District of Georgia, alleging the same violations asserted by the individual plaintiffs before Judge Duff. Four days after filing, Royal Crown received a temporary restraining order against the two proposed acquisitions. Subsequently, the Federal Trade Commission (FTC) voted to commence proceedings under the antitrust laws to prevent these acquisitions. PepsiCo abandoned its agreement to purchase Seven-Up and on June 24, 1986, Judge Duff accordingly dismissed PepsiCo and Seven-Up from the case.

On the same day, the FTC filed a complaint in the United States District Court for the District of Columbia seeking a preliminary injunction to enjoin Coca-Cola from proceeding with its announced acquisition of Dr. Pepper. Judge Gerhard Gesell granted the preliminary injunction, but the Court of Appeals for the District of Columbia later vacated his opinion as moot given Coca-Cola's subsequently announced abandonment of the Dr. Pepper acquisition. Accordingly, on August 7, 1986, after a hearing, Judge Duff dismissed as moot the complaint against Coca-Cola and Dr. Pepper. At this same hearing plaintiffs sought to file an amended complaint addressing the Coca-Cola and PepsiCo acquisitions of three previously independent soft drink bottling companies ("bottlers"). Judge Duff denied the motion to amend and advised the plaintiffs to refile. Before this court is plaintiff Dixie O'Neill's ("O'Neill") amended complaint.

## II. *Facts*

### A. Acquisitions of Bottling Concerns

Coca-Cola and PepsiCo dominate the highly concentrated United States soft drink industry with 37.4% and 28.9% respective national market shares of all carbonated soft drink products. Coca-Cola and PepsiCo produce syrups and concentrates which are sold to bottlers who add carbonated water, bottle, and sell the resulting carbonated soft drinks. Coca-Cola and PepsiCo both grant exclusive territorial marketing areas to their respective trademark licensee bottlers and prohibit them from distributing competing flavors of other companies.

On May 30, 1986, PepsiCo announced its purchase of MEI Corporation ("MEI"), the third largest independent bottler of PepsiCo carbonated soft drink products. On June 16, 1986, Coca-Cola announced its intentions to acquire the soft drink bottling operations of BCI Holding Corporation ("Beatrice"). After complying with FTC regulations concerning this acquisition, Coca-Cola proceeded with its agreement to acquire Beatrice. On January 27, 1986, Coca-Cola also announced a preliminary agreement to merge its company-owned bottling operations with those soft drink bottling operations owned by JTL Corporation ("JTL") and its affiliates. Again, after complying with FTC regulations regarding this merger, Coca-Cola proceeded with its agreement with JTL.

Coca-Cola Enterprises ("CCE") was a wholly-owned subsidiary of Coca-Cola. On September 8, 1986, Coca-Cola announced that it would reduce its ownership in CCE to a minority interest. In a reorganization effort effective September 12, 1986, Coca-Cola transferred to CCE the stock and op-

erating assets of all bottling companies which they owned at the time. CCE then completed the acquisition of Beatrice on September 23, 1986 and of JTL on September 29, 1986. On November 21, 1986, Coca-Cola offered 51% of CCE stock to the public. Coca-Cola owns the remaining 49% of CCE stock. Coca-Cola no longer holds any direct interest in Beatrice or JTL bottling companies.

### B. Transshipment Restrictions

PepsiCo grants each of its licensed bottlers an exclusive territory in which to produce and market PepsiCo products. To protect the exclusivity of these territories, PepsiCo forbids its bottlers to supply retailers who buy or sell outside their territories, buy from or sell to other retailers within their territories, or facilitate transshipment by selling to intermediaries. PepsiCo enforces this policy by firing, boycotting, or otherwise punishing those who violate the noted prohibitions.

### III. *Discussion*

O'Neill brings this action individually as a purchaser of Coca-Cola and PepsiCo carbonated soft drink products, and as a representative of a class of all purchasers of Coca-Cola and PepsiCo carbonated soft drinks, pursuant to Rule 23 of the Federal Rules of Civil Procedure. O'Neill's complaint sets forth two claims. In Count I, O'Neill complains that defendants, with their respective acquisitions of JTL, Beatrice, and MEI bottlers, have violated the antitrust laws, 15 U.S.C. §§ 1, 2, and 18. Specifically, O'Neill alleges that these acquisitions effectively reduce competition in the soft drink industry, thereby increasing prices for herself and all consumers of Coca-Cola and PepsiCo soft drinks. O'Neill asserts that PepsiCo's acquisition of MEI provides PepsiCo with ownership of bottlers that produce approximately 33% of all PepsiCo brand carbonated soft drinks in the United States. O'Neill similarly asserts that Coca-Cola's retention of the largest single interest in CCE stock permits it to control, through CCE, ownership of bottlers that produce approximately 31% of all Coca-Cola brand carbonated soft drinks in the United States.

O'Neill requests this court to declare PepsiCo's acquisition of MEI as well as Coca-Cola's acquisitions of Beatrice and JTL through CCE as violations of Sections 1 and 2 of the Sherman Act and Section 7 of the Clayton Act, 15 U.S.C. §§ 1, 2, and 18. O'Neill additionally asks this court to order CCE to divest from the JTL and Beatrice bottling properties and for PepsiCo to divest of its MEI acquisition.

In Count II of her amended complaint, O'Neill seeks declaratory and injunctive relief against defendant PepsiCo alleging that PepsiCo and other unnamed co-conspirators have contracted, combined, or conspired to prevent price competition in the sale of PepsiCo's soft drink products, thereby violating Section 1 of the Sherman Act, 15 U.S.C. § 1. O'Neill claims that PepsiCo's standard agreement with licensee trademark bottlers prohibits "transshipping", the selling of PepsiCo products to wholesalers or retailers who are engaged in reselling these products outside of the assigned geographic bottling territories or to certain classes of proscribed customers including other retailers. According to O'Neill, the foregoing restrictions on transshipping violate Section 1 of the Sherman Act and result in multiple anticompetitive effects which cause O'Neill and all consumers to pay inflated prices for PepsiCo products.

### A. Standing Requirements Under the Clayton Act

■ Both Sections 4 and 16 of the Clayton Act prescribe who may bring an antitrust suit and the remedies available for antitrust violations. Section 4 requires a plaintiff to show antitrust injury in her business or property and provides for treble damages. Clayton Act, § 4, as amended, 15 U.S.C. § 15. Section 16 provides in part that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws...." Clayton Act, § 16, as amended, 15 U.S.C. § 26.

In *Cargill, Inc. v. Monfort of Colorado, Inc.,* the Supreme Court explains that "standing analysis made under Section 16

will not always be identical to standing analysis under Section 4." *Cargill, Inc. v. Monfort of Colorado, Inc.,* —— U.S. ——, 107 S.Ct. 484, 490 n. 6, 93 L.Ed.2d 427 (1986). Beyond providing for injunctive relief ·instead of treble damages, Section 16 differs from Section 4 in that an individual need not be injured specifically "in business or property" and need only establish a threatened antitrust injury. *Midwest Paper Prod. Co. v. Continental Group,* 596 F.2d 573, 591 (3d Cir.1979). Because of these differences, standing requirements for Section 16 relief are considered less stringent than for Section 4 relief. *See Local Beauty Supply, Inc. v. Lamaur Inc.,* 787 F.2d 1197, 1204 (7th Cir.1986), *citing Hawaii v. Standard Oil Co.,* 405 U.S. 251, 260–61, 92 S.Ct. 885, 890, 31 L.Ed.2d 184 (1972).

The "by reason of" and "by" language included in Sections 4 and 16 of the Clayton Act, respectively, has led the courts to impose various tests on all plaintiffs seeking standing to sue for an antitrust violation. *In re Industrial Gas Antitrust Litigation,* 681 F.2d 514, 516 (7th Cir.1982); *Reibert v. Atlantic Richfield,* 471 F.2d 727, 731 (10th Cir.1973). Because of the recognized differences between Section 4 and Section 16 requirements, as well as the courts' view of injunctive relief as a more flexible tool for antitrust remedies, the various "target area," "direct injury," and "zone of interest" tests devised to determine standing under Section 4 have not been adopted as Section 16 standing requirements.[1] *Hawaii v. Standard Oil Co.,* 405 U.S. at 262–63, 92 S.Ct. at 891–92; *Midwest Paper Prod. Co. v. Continental Group,* 596 F.2d at 592. These tests operate to restrict standing under Section 4 by shortening the acceptable causal chain between the alleged antitrust violation and injury. The absence of the "target area," "direct inju-

ry," and "zone of interest" tests from the Section 16 standing analysis has led courts to the conclusion that the proximity required under Section 16 is "less constrained" than that required under Section 4. *Midwest Paper Prod. Co. v. Continental Group,* 596 F.2d at 591 n. 74, *citing Jeffrey v. Southwestern Bell,* 518 F.2d 1129, 1132 (5th Cir.1975). *See also Schoenkopf v. Brown & Williamson Tobacco Corp.,* 637 F.2d 205, 210 (3d Cir.1980).

This admittedly vague test for Section 16 standing has been the source of substantial confusion. Courts applying this standard have differed on the question of whether threatened antitrust injury must be proved prior to trial as a standing requirement or whether such proof inappropriately involves the merits of the case. Recently, the Supreme Court specifically addressed this issue in *Cargill, Inc. v. Monfort of Colorado, Inc.,* —— U.S. ——, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986). According to the Court, as a matter of standing, a plaintiff seeking injunctive relief under Section 16 must show "proof of threatened loss or damage by a violation of the antitrust laws." *Cargill,* at ——, 107 S.Ct. at 490. Adopting language from *Brunswick v. Pueblo Bowl-O-Mat Inc.,* the Supreme Court required all Section 16 plaintiffs to show an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Cargill, Inc. v. Monfort of Colorado Inc.,* at ——, 107 S.Ct. at 489, *citing Brunswick v. Pueblo Bowl-O-Mat Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). *See also Local Beauty Supply, Inc. v. Lamaur Inc.,* 787 F.2d 1197, 1204 (7th Cir.1986). Thus, a plaintiff seeking standing under Section 16 must show a threatened antitrust injury which is proximately caused by conduct constituting an antitrust violation. Unless each aspect

**1.** PepsiCo and Coca-Cola argue O'Neill is an inappropriate antitrust enforcer by virtue of her failure to meet the "target area," "direct injury," and "zone of interest" tests developed in Section 4 cases. The phrase "appropriate antitrust enforcer," however, is unique to the various tests devised to restrict standing under Section 4 and is not particularly relevant to Section 16 standing principles. Under Section 16, no categories or classes of persons are automatically considered too distant to bring an antitrust suit. Thus, the fact that other soft drink producers or remaining independent bottlers might be more directly affected or suffer greater injury than consumers of soft drinks because of PepsiCo and Coca-Cola's bottling acquisitions does not necessarily preclude consumers like O'Neill from Section 16 standing.

of this test is met, standing under Section 16 will not exist.

### B. Standing to Assert Claims Under Count I

O'Neill, as a consumer, alleges higher prices as her antitrust injury resulting from Coca-Cola's and PepsiCo's vertical acquisitions. Higher prices, as well as lower output, are "the principal vices proscribed by the antitrust laws." *Ball Memorial Hosp. Inc. v. Mutual Hosp. Inc.*, 784 F.2d 1325, 1334 (7th Cir.1986). Although higher prices are specifically recognized as an antitrust injury, the question in this case is whether the alleged antitrust violation proximately threatens plaintiff with such an injury.

■■■ Antitrust laws are designed to protect the economic freedom of participants in the relevant market. *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 538, 103 S.Ct. 897, 908, 74 L.Ed.2d 723 (1983). This protection extends to consumers as well as competitors. Therefore, a consumer proximately threatened by an antitrust injury may be a plaintiff in an antitrust suit, even if the consumer is an indirect purchaser, removed from the level of manufacture or distribution where the antitrust violation occurs.[2] *Id.*

at 538–39, 103 S.Ct. at 908–09, *Ball Memorial Hosp. Inc. v. Mutual Hosp. Inc.*, 784 F.2d 1325, 1333 (7th Cir.1986), *Midwest Paper Prod. Co. v. Continental Group*, 596 F.2d 573, 593 (3d Cir.1979).

O'Neill argues that PepsiCo's and Coca-Cola's acquisitions of MEI, JTL, and Beatrice will have the following anticompetitive effects: increasing barriers to entry and mobility in the carbonated soft drink market; reducing or eliminating existing suppliers, customers, distributors and retailers of all three bottlers; increasing interdependent pricing practices between PepsiCo and Coca-Cola; reducing or eliminating preexisting competition between defendants and the bottlers; and increasing concentration of distribution channels and the industry in general. O'Neill claims that the vertical acquisitions violate antitrust laws and that these mergers, producing the aforementioned results, will increase the price of PepsiCo and Coca-Cola soft drink products, thereby causing her to suffer pocketbook injury.

■■ O'Neill does not specifically allege how higher prices will result from these alleged consequences of the vertical acquisitions. Nor does O'Neill show that higher prices are likely to result from the vertical acquisitions. Indeed, O'Neill burdens this

---

2. Coca-Cola desires this court to derive from *Jeffrey v. Southwestern Bell*, 518 F.2d 1129 (5th Cir.1975), and *Commonwealth Edison Co. v. Allis-Chalmers Mfg. Co.*, 315 F.2d 564 (7th Cir. 1963), a general proposition that consumers who, by virtue of normal chains of distribution, are somewhat removed from a producer's or manufacturer's antitrust activity lack sufficient proximity between the antitrust violation and injuries suffered to maintain Section 16 standing. A close reading of *Jeffrey* and *Commonwealth Edison*, however, undercuts this suggested proposition.

In *Jeffrey* consumers charged that utility rates for phone service were increased due to alleged preditory pricing schemes in which a subsidiary of Southwestern Bell had engaged. *Jeffrey*, 518 F.2d at 1130. Consumers complained that losses incurred by the subsidiary during the period of predatory pricing were reimbursed through higher phone service rates. *Id.* The court ruled, however, that the consumers were without standing under Section 16 because their injuries were not proximately related to the alleged antitrust conduct of the utility's subsidiary. *Id.* at 1132. In large part, the court came

to this conclusion on the ground that the utility's phone service rates were set by a governmental regulatory agency and not the utility. *Id.* Similarly, in *Commonwealth Edison*, electricity consumers were held to lack Section 16 standing to object to price-fixing schemes by manufacturers who allegedly sold Edison power generating equipment at inflated prices. *Commonwealth Edison*, 315 F.2d at 566–67. Stressing that the Illinois Commerce Commission was responsible for fixing the higher utility rates, the court ruled the consumers' alleged injury of inflated electric costs was not proximately related to the manufacturers' antitrust activity. *Id.*

The foregoing makes clear that neither *Jeffrey* nor *Commonwealth Edison* support the concept that consumers who are "twice removed" from antitrust activity will always lack sufficient proximity between the injury and antitrust violation to possess Section 16 standing. Instead, both cases reflect that actions by regulatory bodies in setting utility rates interrupts the chain of legal causation required to sustain a Section 16 claim. As such, Coca-Cola's reliance of *Jeffrey* and *Commonwealth Edison* is misplaced.

court to provide the causal links between what she alleges to be the consequences of the vertical acquisitions and how those consequences result in higher prices.

Accepting O'Neill's allegations of the consequences of vertical acquisitions to be true, higher prices could theoretically result from either of two ways. The reduced competition between the bottlers and manufacturers may allow for an increase in prices by the manufacturer who now owns and controls the bottler's operation and resale prices to the wholesaler. If the wholesaler faces a higher purchasing price from the manufacturer/bottler, the wholesaler could theoretically pass any additional costs on to the retailer who may in turn pass on the increase in price to the consumer. Alternatively, or additionally, O'Neill implies that the vertical acquisitions will increase the potential for interdependent pricing practices between PepsiCo and Coca-Cola. Presumably, O'Neill wishes the court to infer that such potential for interdependent pricing will result in price-fixing, yielding higher prices for the consumer. However, as the following discussion details, O'Neill fails to show that either of these paths to higher consumer prices are probable or proximately threaten her with antitrust injury.

If O'Neill seeks to show higher prices resulting from the elimination or reduction of any preexisting competition between the manufacturer and bottler, her approach fails in two manners. First, O'Neill is unable to show any indication that such elimination of any preexisting competition between bottlers and manufacturers will have any perceivable effect on price. It is not any more self-evident that the elimination of such competition will result in higher prices as opposed to lower prices. For example, the vertical acquisitions may just as likely lead to economies in scale that could reduce prices to consumers as they could theoretically lead to increased prices from manufacturers who now control the bottlers' resale price to wholesalers. O'Neill offers no proof that the elimination of competition will more likely lead to the detrimental consequence of higher prices as opposed to the beneficial consequence of lower prices.

Second, even if this court were to assume that higher prices would naturally result from the elimination of any preexisting competition between the manufacturers and the bottlers, O'Neill does not show that she purchases any of the products of either defendant in any of the areas serviced by the JTL, Beatrice, or MEI acquisitions. Even if this court were to assume that higher prices threatened a consumer serviced by these bottlers and that higher prices were proximately related to the vertical acquisitions, absent evidence that she resides in an area serviced by or regularly purchases from retailers receiving carbonated beverages from these bottlers, O'Neill cannot be considered to suffer any injury.[3]

The only proof O'Neill proffers to support her perceived threat of injury from the vertical acquisitions is an opinion authored by Judge Gesell in *FTC v. The Coca-Cola Co.*, 641 F.Supp. 1128 (D.D.C.1986), *vacated*, 829 F.2d 191 (D.C.Cir.1987). Yet, O'Neill's reliance on this opinion to establish a threatened injury is greatly misplaced. Not only had Judge Gesell's opinion been vacated and therefore presents no basis of judicial authority, the opinion addresses an entirely different factual setting. Judge Gesell's opinion refers to Coca-Cola's now abandoned plan to horizontally acquire Dr. Pepper. The judge's dicta concerning manufacturers' control over their channels of distribution is in reference to the threat

---

**3.** Coca-Cola's attempt to further remove O'Neill from the alleged antitrust violation by narrowing the relevant product market, however, is unpersuasive. Maintaining that syrups are, as a product, distinct from carbonated beverages is an overly restrictive definition of the relevant market. Coca-Cola's reliance on *International Ass'n of Machinists v. Organization of Petroleum Exporting Countries*, 477 F.Supp. 553, 574 (D.C. Cal.1979), *aff'd* 649 F.2d 1354 (9th Cir.1981), is misguided. There the court did not distinguish between crude oil and gasoline as products to limit the relevant market, but instead to demonstrate plaintiff's inability to establish causation between higher crude prices and higher gasoline prices absent any indication that plaintiff's gasoline specifically included defendants' crude oil. *Id.* In the case at bar, Coca-Cola does not and cannot assert that its syrup does not find its way into plaintiff's carbonated Coca-Cola products.

posed by a horizontal merger increasing market share, not a vertical acquisition consolidating bottling operations.

■ Similarly, O'Neill's implied claim that vertical acquisitions will result in interdependent pricing that will yield higher consumer prices is fatally speculative. O'Neill offers no indication that vertical acquisitions have any rational nexus to the potential for interdependent pricing practices between the defendants. Again, even if this court were to assume true that interdependent pricing was a natural consequence of such vertical acquisitions, O'Neill does not claim she purchases products from any of the retailers serviced by the acquired bottlers. What Coca-Cola and PepsiCo acquire within their respective vertical chains of production, distribution, and sales has no self-evident, logical relationship to how they may behave outside of their individual vertical chains toward each other and ultimately toward the consumer. Acquiring independent bottlers may have serious ramifications for other independent bottlers who do business with these defendants within their respective vertical markets. It does not, however, dictate how PepsiCo and Coca-Cola will behave toward each other or whether such acquisitions are more likely to lead to collusive pricing as opposed to predatory pricing. Pure speculation, or vaguely defined links are not sufficient to establish a chain of causation that demonstrates a threat of antitrust injury. *See Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 540–46, 103 S.Ct. 897, 909–12, 74 L.Ed.2d 723 (1983). Mere opinion or conclusory statements of what may happen when three bottlers are purchased by two dominant concentrate manufacturers are not sufficient to establish price-fixing as a threatened antitrust injury.

O'Neill substitutes economic textbook hypotheticals for facts. Worse, she does not even provide the relevant textbook allegations. O'Neill is required to allege the causal links between the allegedly illegal acquisitions and her pocketbook injury.

Absent any proof that a plaintiff is proximately threatened by an antitrust injury, "the plaintiff does not have a claim cognizable under the antitrust laws." *Midwest Communications v. Minnesota Twins*, 779 F.2d 444, 450 (8th Cir.1985). Because O'Neill fails to assert any logical connection between vertical acquisitions and how they ultimately affect the regional or national pricing policies of PepsiCo and Coca-Cola, O'Neill is unable to establish that she is proximately threatened by an antitrust injury. As such, O'Neill is without standing and defendants' motions to dismiss Count I of the amended complaint are granted.

### C. Standing to Assert Claims Under Count II

■ As with Count I, a plaintiff seeking injunctive relief must show an antitrust injury that "flows from that which makes the defendant's acts unlawful." *Cargill, Inc. v. Monfort of Colorado, Inc.,* — U.S. ——, 107 S.Ct. 484, 489, 93 L.Ed.2d 427 (1986), *citing Brunswick Corp. v. Pueblo Bowl-O-Mat Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697–98, 50 L.Ed.2d 701 (1977). O'Neill is required to prove an antitrust injury that proximately results from an antitrust violation. Because this court finds that O'Neill has not shown any antitrust violation or unlawful acts committed by PepsiCo, this court does not address the injury alleged or its proximate relation to defendant's conduct.

O'Neill claims that Section 1 of the Sherman Act is violated by certain policies that PepsiCo and its trademark bottlers implement which place certain constraints on PepsiCo retailers. Specifically, O'Neill attacks the following practices affecting PepsiCo retailers which require: (1) retailers to buy and sell PepsiCo products only within the geographic bottling territories granted to the licensee bottlers in which the retailer is located; (2) retailers not to sell to certain designated classes of customers, including but not limited to other retailers; and (3) retailers who buy or sell PepsiCo products from or to other retailers in contravention to the forementioned rules to be boycotted. Unfortunately, none of these practices are

proscribed by Section 1 of the Sherman Act. Instead, the conduct alleged by O'Neill is sanctioned as an exception to antitrust law by the Soft Drink Interbrand Competition Act of 1980 (the "Act"), 15 U.S.C. § 3501 *et seq.*

The Act provides in pertinent part as follows:

> Nothing contained in any antitrust law shall render unlawful the inclusion and enforcement in any trademark licensing contract or agreement, pursuant to which the licensee engages in the manufacture (including manufacture by a sublicensee, agent, or subcontractor), distribution and sale of a trademarked soft drink product, of provisions granting the licensee the sole and exclusive right to manufacture, distribute, and sell such product in a defined geographic area or limiting the licensee, directly or indirectly, to the manufacture, distribution, and sale of such product only for ultimate resale to consumers within a defined geographic area: Provided, that such product is in substantial and effective competition with other products of the same general class in the relevant market or markets. 15 U.S.C. § 3501.

O'Neill claims that this statute does not apply to independently owned resellers (i.e. bottlers, wholesalers, retailers) who do not have trademark licensing agreements with PepsiCo. O'Neill characterizes the PepsiCo vertical distribution policies as *per se* restraints of horizontal competition, specifically alleging that PepsiCo restrains retailers who are in a horizontal relationship with other PepsiCo retailers. In so doing, O'Neill attempts to bring PepsiCo's behavior under Section 3502 of the Act. This section exempts "otherwise unlawful" horizontal restraints of trade and group boycotts from the activities permitted under Section 3501 of the Act.

O'Neill attempts to substantiate her Section 1 claim with an impressive list of cases. However, most of the cases O'Neill cites were decided years before the Act was passed. The balance of cases cited by O'Neill deal with factual situations unrelated to the soft drink industry and include no discussion of the Act. This court finds that the Act's clear language, legislative history and case law interpretation overwhelmingly indicate that PepsiCo's challenged behavior is exempt from scrutiny under the antitrust laws.

Section 3501 of the Act prohibits antitrust law from "directly or indirectly" limiting the enforcement of a trademark licensing contract or agreement to distribute soft drink products. 15 U.S.C. § 3501. The legislative history of the Act confirms the purpose of Section 3501 is to exempt from the antitrust laws agreements which essentially forbid transshipping of soft drink products by resellers. *See e.g., Hearings before the Subcommittee on Monopolies of the House Committee on the Judiciary on H.R. 3567 and H.R. 3573,* 96th Cong., 1st & 2d Sess. 229–30, 518, 528 (1980) (questions posed by Chairman Rodino) ("under this legislation, the retailer would not be able to purchase soft drinks outside the territory"); 126 Cong.Rec. 11358 (remarks by Sen. Baucus); S.Rep. No. 645, 96th Cong., 2d Sess. 10 (1980) (bill precludes "indirect evasions" of license agreements); S.Rep. No. 188, 93d Cong., 1st Sess. 5–6 (1973), 1980 U.S.Code Cong. & Admin.News 2373 ("bill makes lawful license provisions which have the effect of precluding indirect evasions of the license agreement").

Case law also controverts O'Neill's attempt to characterize PepsiCo's conduct as violative of the antitrust laws. In *Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc.* the First Circuit upheld the manufacturer's and bottler's right to enforce their policy against transshipping. *Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc.,* 754 F.2d 10, 18 (1st Cir.1985). The court specifically noted that "to the extent there was any question whether Pepsi-Cola, Inc. and Metropolitan were entitled to limit sales so as to maintain PepsiCo's system of exclusive territorial dealerships, their right to do so was bolstered by the Soft Drink Interbrand Competition Act...." *Id.*

▪ Additionally, O'Neill's claim is specifically addressed by Judge Caldwell in *Pennsylvania ex rel. Zimmerman v. Pep-*

*siCo, Inc.,* 658 F.Supp. 816 (M.D.Pa.1987). In this case, the Commonwealth of Pennsylvania, as *parens patriae,* alleged the identical claims made by O'Neill in the present case. Judge Caldwell concluded that both the Commonwealth's attempt to characterize the defendants' behavior as a *per se* illegal horizontal conspiracy, and the Commonwealth's assertion that defendants engaged in an illegal group boycott were without merit because under the Act, the manufacturer and bottlers were "clearly authorized" to prevent the practice of transshipping. *Id.* at 821–24. This court agrees with Judge Caldwell that "it would be totally unreasonable" given the history of the industry and the Act, to conclude that PepsiCo's conduct constituted a horizontal conspiracy. *Id.* at 822. Furthermore, this court agrees that the practice of boycotting and other means used to reasonably enforce the distribution policies are "made lawful by the Act," and therefore Section 3502 is not applicable to the PepsiCo policies of which O'Neill complains. *Id.* at 824.

Because O'Neill fails to allege any unlawful acts or antitrust violations committed by PepsiCo, this court need not address whether her alleged pocketbook injury is an antitrust injury that proximately results from PepsiCo's behavior. O'Neill fails to meet a threshold requirement for standing to sue under Section 16, and therefore, PepsiCo's motion to dismiss Count II is granted.

### IV. *Conclusion*

For the foregoing reasons, defendants' motions to dismiss both counts of plaintiff's amended complaint are granted.

IT IS SO ORDERED.